TEVIS *v.* RYAN.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 189. Argued January 23, 26, 1914.—Decided April 6, 1914.

Covenants in a contract between individuals who control a corporation, in regard to disposition of its outstanding stock, construed in this case to import a personal responsibility on the parties and not on the corporation.

In this case, the cause of action being not on the contract alone, but also upon alleged fraudulent conduct, evidence as to oral declarations of the defendant was admissible to show the misrepresentations alleged as basis for the claim of fraudulent inducement to make the contract and fraudulent use of the property entrusted to the defendant thereunder.

Notice to either of joint contractors is notice to both.

A written paper offered and admitted as evidence of a demand and not objected to as coming too late is not inadmissible because it contains other matter. The proper course for the party objecting is to ask an instruction limiting the effect of the paper to the demand or else to base the objection on its coming too late.

A contract, providing that in a specified contingency the interest of the parties surrendering control to the other party shall revest in them in the same proportion and ratio as they held on the making of the contract, was properly construed as contemplating that

the surrendering parties be restored to the same proportionate inter-
est in the property as they held prior to the making of the agreement.
In affirming the judgment of the Supreme Court of the Territory of
Arizona which has been reduced by remittitur, this court does not
necessarily hold that the rulings of the court below were indubitably
correct, and it also takes into consideration Rev. Stat. Arizona 1901,
par. 1588, providing in substance that the trial court shall not be re-
versed for want of form if there is sufficient matter of substance in
the record to enable the Supreme Court to decide the case upon the
merits, and that excessive damages may be remitted pending the
appeal.
This court is not lightly disposed to disturb the decision of a territorial
Supreme Court turning, as it does in this case, largely upon local
practice.
13 Arizona, 282, affirmed.


THIS action was brought by defendants in error against
Tevis and McKittrick, two of the plaintiffs in error, in a
district court of one of the counties of the then Territory
of Arizona. The trial resulted in a verdict and judgment
in favor of plaintiffs below for $132,000. On appeal, the
Supreme Court of the Territory held that because of error
affecting the amount of the damages, $64,564.63 of the
verdict ought to be remitted, and that upon the filing of a
remittitur judgment should be entered in favor of plain-
tiffs below for the remaining sum of $67,435.37. 13 Ari-
zona, 120. Both parties filed petitions for a rehearing,
with the result that the court adhered to its former view.
13 Arizona, 282. Plaintiffs having filed the remittitur,
judgment was entered in their favor for the last mentioned
sum, and the present writ of error was sued out.

The controversy arises out of the following transactions.
In the year 1902 plaintiffs and defendants were stock-
holders in an Arizona corporation known as the Turquoise
Copper Mining & Smelting Company, which owned
mining properties in Cochise County, Arizona. The
stock consisted of 100,000 shares, of the par value of
$10 each, of which the Ryans together owned four-

sevenths and Tevis and McKittrick owned three-sevenths. The Ryans were in control of the board of directors. About $160,000 had been expended towards the development of the mines, and this had been contributed by the respective parties in proportion to their holdings of stock, plaintiffs having contributed about $90,000, defendants about $70,000. One Bryant had secured a judgment and levied execution upon the property of the company, under which the mines had been sold on July 30, 1902, to one McPherson, subject to redemption on or before January 31, 1903. In this situation of affairs plaintiffs met the defendant McKittrick in Wilcox, Arizona, on November 29, 1902, and, after some negotiation, a written contract was drawn up and by them signed. Defendant Tevis was not present at this meeting, and the agreement was made contingent upon his signing, as he did a few days later. It reads as follows:

"This agreement, made and entered into this 29th day of November, 1902, by and between W. S. Tevis and W. H. McKittrick, of Bakersfield, California, parties of the first part, and Jepp Ryan, T. C. Ryan, and E. B. Ryan, of Leavenworth, Kansas, parties of the second part,

"Witnesseth: That, whereas, the parties above mentioned represent all the stock in the Turquoise Copper Mining and Smelting Company, a corporation organized and existing under the laws of the Territory of Arizona, and doing business in Cochise County, Arizona, and

"Whereas, the parties of the first part now own and control three-sevenths of the capital stock of the said corporation, and the parties of the second part four-sevenths of the capital stock thereof; and

"Whereas, the parties of the first part are desirous of securing the controlling interest of the said capital stock of the said corporation, and thereby obtain the full management of the affairs of the said corporation;

"Now, therefore, in consideration of, that the capital

stock of the said corporation shall be changed from its original capitalization to one million shares of the par value of one dollar each share, and that 240,000 of said shares of said capital stock shall be placed in the treasury of the said company, to be sold in whole or in part by the said parties of the first part, at such price or prices as the board of directors of said corporation may deem advisable, and the moneys received from such sale or sales shall be used as follows: First, to pay off and liquidate a certain judgment held by T. B. McPherson, of Omaha, Nebraska, or his assigns, against the said corporation, in the amount of about $25,532.47 dollars. Second, to use the next $20,000 received from the sale of said stock to develop the claims now owned and controlled by this company; the parties of the second part hereby agree to and with the parties of the first part, that the officers in the said corporation now representing the interest of the parties of the second part shall resign from said office or offices, and allow the parties of the first part to appoint or elect such officers in their place and stead as they may desire, said second parties agree to give the parties of the first part as their interest in the said company, a total of 280,500 shares of the capital stock thereof, and the parties of the second part shall receive as their portion 279,500 shares of capital stock of the said company. That the remaining 200,000 shares shall be divided between the parties hereto in the proportion of 101,000 shares to the first parties, and 99,000 shares to the parties of the second part; said 200,000 shares shall be issued to W. H. McKittrick, as trustee for the parties hereto. All of the parties hereto agree to use their best endeavors to sell as much of the said last-mentioned shares as possible, at not less than par value, and the proceeds of any of such sales of said block of stock shall be divided pro rata among the parties hereto, until they have been fully reimbursed for the money they now have expended upon this property,

amounting to about $160,000, when the remaining shares shall be divided equally among them, according to their respective interests in the ratio aforesaid.

"It is further understood and agreed between the parties hereto that they shall not be allowed to sell any of their individual holdings of stock in this company until the block of 200,000 held in trust for all shall have been sold, or apportioned, as above set forth. The parties of the second part shall not be liable for any expense connected with the operation of this company, excepting the expense of selling the stock held in trust for the parties hereto. The parties of the first part shall have a term of two years in which to comply with all the requirements of this contract. Should they fail or refuse to comply with all the agreements and stipulations herein mentioned within the period aforesaid, then this agreement shall become null and void and of no effect, otherwise to remain in full force and effect. Should this contract be annulled by any failure of the parties of the first part to do any and all things herein required of them, then the interest of the second parties shall reinvest in them in the same proportion and ratio as they held and were possessed of at the signing of this agreement.

"It is further understood and agreed by and between the parties hereto that W. S. Tevis, not being present upon the signing hereof, that ten days' time be allowed him in which to sign and ratify the same. Should he fail or refuse to do so within the period above mentioned, then this instrument shall be null and void in respect to all parties hereto. All erasures and changes and interlineations were made prior to the signing of this instrument.

"Witness our hands, the day and year first above mentioned."

In accordance with the agreement, a reorganization of the company was effected, the Ryans resigned as directors, control of the directorate passed to Tevis and McKittrick,

and the capital stock was changed so as to consist of 1,000,000 shares, of the par value of $1 each, which were allotted as prescribed by the contract, viz:

| | |
|---|---|
| To Tevis and McKittrick........... | 280,500 shares |
| To the Ryans..................... | 279,500 " |
| To McKittrick as Trustee....:...... | 200,000 " |
| Treasury stock................... | 240,000 " |
| Total................ | 1,000,000 " |

The mines of the company were redeemed from the sheriff's sale with $30,000 loaned for the purpose by Tevis upon the company's note. This note, with others given by the company for the interest upon it, was transferred by Tevis to the Western Company of California, a corporation controlled by him.

The reorganized Turquoise Company did not prosper. Defendants sold 32,000 shares of the treasury stock at 25c per share, netting $8,000, and the remaining 208,000 shares at ¾c per share, netting $1,560. This money was spent in operating the mines and in paying for a diamond drill, for patents, and for attorney's fees. In May, 1905, the Western Company secured judgment against the company in a California court for the amount of the notes and interest, aggregating $44,078.05, and an action was brought on this judgment in Cochise County, Arizona, resulting on July 20, 1905, in a judgment for $44,549.43. On this same day McKittrick secured judgment against the company for $9,975 for services as general manager from May, 1903, to June, 1905. The following day (July 21, 1905) execution was levied against the mining properties to satisfy the judgments of McKittrick and the Western Company; and on July 11, 1906, the property was sold by the sheriff to that company. A few days later defendants, with others, organized the Tejon Mining Company under the laws of Arizona, and two years afterwards the Western Company conveyed the mining prop-

erties formerly of the Turquoise Company to the Tejon Company.

The present action was commenced November 30, 1906, and, after repeated modifications of the pleadings, came on for trial upon a complaint which, besides setting up the above facts, averred that after two years from the twenty-ninth day of November, 1902, had elapsed, and after plaintiffs were informed that defendants had failed to sell the 240,000 shares of the Turquoise Company for sufficient funds to pay the money advanced by them to redeem the property of the company from the sheriff's sale, and before the action of the Western Company against the Turquoise Company was commenced in the California court, to wit, on February 15, 1905, plaintiffs informed defendants that they desired to be reinvested with their interest in the property of the Turquoise Company and to be restored to their interest therein the same as before November 29, 1902, and informed defendants that they were then ready, able, and willing to pay defendants four-sevenths of the sum of $25,262.60 paid to redeem the property from the sale of July 31, 1902; and that defendants ignored said request. There were allegations of fraudulent conduct, in support of which certain evidence was introduced, but these allegations seem to have been abandoned; at least the trial judge submitted the case to the jury solely upon the ground of a breach of the contract.

*Mr. Edward H. Thomas,* with whom *Mr. Aldis B. Browne, Mr. Alexander Britton, Mr. Evans Browne, Mr. Ben Goodrich* and *Mr. A. C. Baker* were on the brief, for plaintiffs in error.

*Mr. Eugene S. Ives* for defendants in error.

MR. JUSTICE PITNEY, after making the foregoing statement, delivered the opinion of the court.

The trial judge in submitting the case to the jury

adopted the following construction of the contract of
November 29, 1902: That it provided for a general scheme
to be carried out within the period of two years; that
control of the Turquoise Company was to be given to
defendants McKittrick and Tevis, and with a board of
directors of their own choosing they were to carry on the
business of the company, and within two years were to
carry out the plan for the rehabilitation of the company
according to the stipulations of the agreement; that they
did not guarantee successful results, but were simply to
use their best endeavors to carry out the plan; that if
there was a failure on their part to do the things con-
templated within the two years, this of itself did not
raise any legal obligation on their part to the plaintiffs;
but that if at the end of the two years the scheme con-
templated by the contract had not been accomplished,
then defendants agreed to reinvest plaintiffs with the
interest they had at the time of entering into the contract,
provided plaintiffs demanded that reinvestment. The
jury were instructed that they should first determine
whether at the expiration of the two years specified in the
contract the situation was such that defendants were
obligated to reinvest plaintiffs with the four-sevenths
interest in the company that they formerly held. That
if so, the next question was whether plaintiffs ever de-
manded that they should be so reinvested, for if there
was no demand there was no liability on the part of
defendants; but that if plaintiffs did make such demand
-within a reasonable time after the expiration of the two
years it was the duty of defendants to comply with it; that
certain evidence introduced to show a written demand
made at a time in the summer of 1906 should be rejected
because such demand, if made, came too late; but that if
the jury should find [as, in fact, certain other evidence
tended to show] that a demand was made on defendants
by plaintiffs a few months following the expiration of the

two years and in the early part of 1905, that was a reasonable time in which to make the demand. The further instruction was that if there was a breach of the agreement by defendants in failing to reinvest plaintiffs as they ought to have done, the next question was the amount of the damages; and as to this, that what defendants agreed to do was to put plaintiffs back as nearly as might be in the situation they were in when the contract was made; that at that time the property was about to be foreclosed, and subsequently money was raised to redeem it from the judgment, and the money thus used became a debt against the company, and this should be considered by the jury, because plaintiffs ought not to be put back in possession of their interest in the property free and clear of any such incumbrance as stood upon it when the contract was made; "So if you should come to this question of damages at all, you should ascertain the damages in this way: You should ascertain the value of this mining property— this property that was owned by the Turquoise Copper Mining & Smelting Company—at the time the demand of the Ryans to be reinvested was made, if any such demand was made at all—ascertain first the value of that property. Then deduct from that value the amount of this claim of the Western Company which loaned this money, with interest, which at that time amounted to at least $39,000. Then take that balance, if there is any—the value of the property, from which deduct the $39,000, and if there is any balance left—that belongs to the plaintiffs and defendants in the proportion that they owned the property— that is, the Ryans four-sevenths and Tevis and McKittrick three-sevenths. So the Ryans would be entitled to four-sevenths of the balance after you deduct from the value of the property the amount of this Western Company's claim—this $39,000. So of course, it follows that if the value of the property was not so much as $39,000 they would not be entitled to anything."

There were no requests for particular instructions, and no specific objection to the instructions as given.

In the Supreme Court of the Territory the principal question raised was as to the correctness of the instruction respecting the measure of damages. In passing upon this, the appellate court interpreted the contract as binding defendants (in the event of the failure of the scheme, and a demand made for reinvestment) to turn over to plaintiffs, not a four-sevenths interest in the mining property, but a four-sevenths interest in the capital stock of the company. At the same time it was held that the trial court, in apparently adopting as a measure of damages the four-sevenths interest in the property of the corporation, did not actually construe the reinvesting clause to extend to the property or the mines of the corporation; but that the instruction was tantamount to an instruction that plaintiffs were entitled to the value of four-sevenths of the capital stock, which was the equivalent of, and was to be ascertained by determining from the evidence the value of, four-sevenths of the net assets of the corporation. And the appellate court held, as to this, that the result was right, and hence the judgment ought not to be reversed, though the instruction as given might be open to criticism as to its form, and even though the jury might have based their verdict upon an incorrect theory.

But it was held that the measure of damages as applied by the trial court was erroneous in failing to deduct from the valuation of the four-sevenths a proper allowance for the 279,500 shares of stock of the Turquoise Company that had been retained by the Ryans under the terms of the contract, and were still owned by them.

The court overruled certain minor contentions on the one side and on the other, and, finding that the proximate damage resulting from the breach of the contract was the loss of the value of the stock that was agreed to be returned, and that the loss of the value of the 279,500 shares

retained (attributed, as it was, to subsequent mismanagement of the company by Tevis and McKittrick), was only a remote and indirect consequence, and not such as was in contemplation at the time of the making of the contract as a probable result of such breach, held that there was error (and error only) in including in the allowance of damages the loss of the value of the retained shares. The court further found that the evidence and the verdict of the jury afforded a basis for computing the correct sum to be awarded, in that the jury by its verdict found in effect that the value of the entire capital stock of 1,000,000 shares of the Turquoise Company at the time of the breach of the contract was $231,000 (four-sevenths of this sum being $132,000, the amount of the verdict). Taking four-sevenths of the entire number of shares (or 571,428 shares) and deducting the 279,500 shares retained by the plaintiffs, there remained 291,928 shares, which, computed upon the basis afforded by the verdict of the jury, yielded $67,435.37 as the proper amount of the recovery. And under the provisions of paragraph 1588 of the Revised Statutes of 1901 and the practice approved in *Kennon* v. *Gilmer*, 131 U. S. 22, 29, plaintiffs were put to their election to either remit the excess beyond that amount or submit to a new trial, with the result mentioned in the prefatory statement.

It is now contended by plaintiffs in error that the interpretation of the contract adopted by the trial court, and followed by the appellate court respecting the question of liability, is unwarranted by anything in the language of the instrument. It is said that Tevis and McKittrick did not agree, as the trial court held they did, that they personally would use their best endeavors to do the things that were in contemplation. It is said that the directors of the corporation were to fix the price of the treasury stock and to use the money derived from its sale in the manner indicated; that Tevis and McKittrick were to be merely

the agents of the board of directors (if that board should so determine), without authority to fix the price of the stock, pay the judgment, or use the money to develop claims or in any other way for the company's benefit; that if the directors should fail to give such authority, Tevis and McKittrick could do nothing; that they did not covenant or agree that the stock would sell for any particular price, much less that it would sell for $20,000 more than the amount of the judgment; that the terms of the agreement show merely the expectations of the parties, which as the event befell were not realized, and that the agreement and all its stipulations were conditional upon the sale of the stock for a sufficient price to meet the purposes indicated. The insistence is that the Ryans simply sold and transferred a controlling interest in the stock in consideration of a future authority to sell the treasury stock for a price in no wise fixed, and that there was no agreement that Tevis and McKittrick were to contribute or pay anything to the company; that as between the corporation and the shareholders the 240,000 shares of treasury stock were contributed outright to the corporation, which by the terms of the agreement had the right to sell it; and that Tevis and McKittrick did not undertake to bind the company to return or pay for this stock.

The gist of the argument seems to be that Tevis and McKittrick incurred no personal liability except possibly to see to it that the capital stock of the company was changed from its original capitalization (100,000 shares, of the par value of $10 each), to 1,000,000 shares, of the par value of $1 each, that 240,000 of the new shares were placed in the treasury of the company, and that the board of directors of the corporation fixed a price for the sale of these shares.

The agreement shows on its face that it was not prepared by a skilled person; and it requires construction. But we think it was binding upon defendants, at least to

the extent that the decision of the territorial Supreme Court gave effect to it.

The argument for plaintiffs in error attributes too little force to what is referred to as the "reinvestment clause," viz: "The parties of the first part shall have a term of two years in which to comply with all the requirements of this contract. Should they fail or refuse to comply with all the agreements and stipulations herein mentioned within the period aforesaid, then this agreement shall become null and void and of no effect, otherwise to remain in full force and effect. Should this contract be annulled by any failure of the parties of the first part to do any and all things herein required of them, then the interest of the second parties shall reinvest in them in the same proportion and ratio as they held and were possessed of at the signing of this agreement." This imports, at least, that if the project for rehabilitating the company, in contemplation of which the Ryans divested themselves for the time of the majority interest and control of the company, should come to naught, they should be reinvested with the same proportion of the stock of the company that they had held before. But the company was not named as a party to the agreement, and, even if treated as a party by implication, could hardly be supposed to covenant for a transfer of the outstanding stock. Hence the covenant quoted could bind Tevis and McKittrick, only, who themselves were to be placed in control of the company, and of the very stock that would need to be retransferred in order to fulfill the stipulation. Consequently, it imports a personal responsibility on their part to see to it that the Ryans were "reinvested" in accordance with the terms of the covenant.

It is insisted that if certain declarations of McKittrick, said to have been made during the negotiations that immediately preceded the signing of the contract, be eliminated, there is nothing in the terms of the instrument,

or in the circumstances under which it was made, to warrant the interpretation adopted. In this view we do not concur, for reasons already indicated.

The declarations referred to are also said to have been erroneously admitted. They were made by McKittrick in the absence of Tevis at the interview of November 29, 1902. Jepp Ryan, one of the plaintiffs, being called as a witness and asked to state the conversation between McKittrick and himself testified: "He went out and had an agreement made and brought it up into our room. Now, he says, 'Boys, Mr. Tevis is a multi-millionaire and rich and influential, and by putting him in control of this property, or giving us control of the property, we will try to handle it so each of us can get all our money back.' I says, 'Captain, suppose you don't handle it, where do we come in.' He says, 'If we don't sell the stock we will return to you the property the same as it is to-day.'" It appeared that this was after the contract was drawn up and before it was signed. A motion was made to strike it out "because the contract speaks for itself." This, the only objection, was overruled. Each of the other plaintiffs was permitted, over the like objection, to give evidence of a similar import.

If the action had been based alone upon the written instrument there would be force in the objection to the introduction of parol evidence of previous promises inconsistent with the terms of the writing. But the action was not so limited. The pleading upon which the parties went to trial (the third cause of action in the third amended and supplemental complaint) relied not upon the contract alone, but also upon alleged fraudulent conduct, beginning with representations of the abundant means and property of the defendants, on the strength of which, as was said, the plaintiffs entered into the written agreement, and followed by alleged fraudulent use of the control of the company that was turned over to Tevis and McKittrick

in pursuance of the terms of the agreement. The evidence of the oral declarations of McKittrick was admissible upon this question; and the fact that the allegations of fraud were afterwards abandoned, or were held by the trial court not to be sufficiently supported, does not render erroneous the previous rulings upon the admissibility of the evidence referred to.

For like reasons we find no error in the testimony to show that the Ryans were not notified, until long afterwards, that suit had been brought by the Western Company against the Turquoise Company in California, or that suit had been brought upon this judgment in Cochise County, Arizona. Assuming, for argument's sake, that defendants were under no duty to keep plaintiffs informed in regard to the status of the company, and that the contract did not require that they should do so, it nevertheless was a circumstance of more or less significance upon the question of fraud, that events of such consequence to the company were not communicated to parties who held legal and equitable rights such as the Ryans concededly held.

It is contended that the appellate court erred in holding that there was sufficient evidence to show a demand for reinvestment made by plaintiffs upon defendants. The complaint alleged two such demands, one on February 15, 1905, the other on August 26, 1906. Plaintiffs introduced testimony in regard to an oral demand claimed to have been made in May, 1905, and it was upon this alone that the trial court permitted the case to go to the jury. It is contended that this demand was insufficient because not made in proper form, nor made in a proper place, and made only upon McKittrick, and not upon Tevis also. Assuming, as both courts held, that a special demand was necessary, it seems to us that the oral demand referred to is not open to the objections made to it. McKittrick and Tevis were joint contractors, so that notice to either was

notice to both. And there is no doubt that it was sufficiently specific to fairly warn defendants that they were called upon to perform their engagement under the reinvestment clause.

Objection is made to the trial court's ruling, sustained by the appellate court, admitting in evidence a written demand served by plaintiffs upon defendants, marked Exhibit "K." · This was a letter, undated, but apparently written after July 11, 1906, and stated to have been served upon defendants in September of that year. Its admission was not objected to on the ground that it did not evidence a proper demand (this, indeed, was admitted) nor on the ground that the demand came too late, but only because of other matters contained in the letter. The trial court having refused to exclude it as evidence, subsequently instructed the jury that as a demand it came too late to furnish a proper support for plaintiffs' cause of action. The contention now is that because of self-serving declarations contained in it, Exhibit "K," ought to have been excluded entirely from the consideration of the jury, and that it was likewise inadmissible because it contained veiled charges of fraud on the part of the defendants, and also offers of compromise made by the plaintiffs. But we have already pointed out that the action was in part based upon fraud, and we are not prepared to say that the fact that Exhibit "K" contained insinuations attributing fraud to defendants, coupled with the fact that defendants did not respond to it, would not in some degree tend to support this charge. It is sufficient, however, to say that the paper was introduced as evidence of a demand, and was admissible for that purpose (in the absence of objection based on the time of its delivery), since it contained a notice that plaintiffs insisted that defendants should comply, as well as might then be done, with the provisions of the agreement. The fact (if it were a fact) that it also contained matters irrelevant to the demand would not

render the document inadmissible. The proper course would have been for defendants to request an instruction limiting the effect that should be given to it by the jury; or, if intending to insist that it came too late to constitute a proper demand, then to exclude the paper from consideration. The present objection was not properly raised at the trial.

It is insisted that the court erred in holding that plaintiffs, under the averments of the complaint, were entitled to recover the value of a four-sevenths interest in the stock of the company. The basis of the objection is that such a recovery was inconsistent with the cause of action set forth in the complaint, which, it is said, sought a recovery of a four-sevenths interest in the property of the Turquoise Company, and not the value of four-sevenths of its share stock. This is a mere question of pleading, and is sufficiently disposed of in the opinion of the appellate court below.

It is contended that there was error in sustaining the trial court's instruction that the measure of plaintiff's damages was four-sevenths of the value of the mining company's property, minus the indebtedness to the Western Company. As already shown, however, the appellate court did not sustain this interpretation of the contract, but in terms rejected it; at the same time holding that the trial court, in referring to the value of a four-sevenths interest in the property of the corporation as a test for the measure of damages, in effect reached a correct result through the employment of inaccurate phraseology, and that although the jury may have found their verdict upon an incorrect theory, the error was harmless and the judgment should not be reversed, because under the evidence the rule adopted made no substantial difference in the result, saving as to the 279,500 shares, and as to this the error was easily cured by applying the proper correction as above mentioned.

VOL. CCXXXIII—19

Finally, the point is made that, assuming the alleged error of the trial court could be cured by a remittitur, the ruling of the Supreme Court and the remittitur as entered accounted only for the 279,500 shares that were retained by the Ryans under the contract; and it is insisted that the 200,000 shares of trust stock to which McKittrick held the legal title, with the 240,000 shares of treasury stock, the legal title to which was in the company and over which defendants had no control except in their capacity as directors of the company, should have been deducted from the entire share capital of 1,000,000 shares, and the plaintiffs allowed only the value of four-sevenths of the difference, less the 279,500 shares that they retained. Without spending further time in discussion, we will simply say that in our opinion the view suggested is inconsistent with the terms of the covenant, which was that in the contingency provided for "the interest of the second parties shall reinvest in them in the same proportion and ratio as they held and were possessed of at the signing of this agreement." This, we think, contemplated that they should be restored to the same proportionate interest that they held prior to the making of the agreement.

In affirming the judgment we are not to be understood as holding that the rulings of the court below were indubitably correct. In dealing with the instructions of the trial court respecting the mode of ascertaining the damages, and in permitting the filing of a remittitur and affirming the judgment for the residue of the verdict, the Supreme Court of the Territory acted under the Revised Statutes of Arizona, 1901, paragraph 1588, which provides, in substance, that there shall be no reversal on an appeal or writ of error for want of form provided sufficient matter or substance be contained in the record to enable the court to decide the cause upon its merits; and also provides for remitting excessive damages pending the appeal. The record in the present case came fairly within the purview of

this provision. And we are not disposed to lightly disturb the decision of a territorial Supreme Court turning so largely, as this does, upon the local practice. *Phœnix Ry. Co.* v. *Landis*, 231 U. S. 578, 579; *Work* v. *United Globe Mines*, 231 U. S. 595, 599; *Montoya* v. *Gonzales*, 232 U. S. 375, 376.

We have dealt with all the questions that appear to have been raised in the Supreme Court of the Territory. Others we need not notice. *Gila Valley Ry. Co.* v. *Hall*, 232 U. S. 94, 98.

*Judgment affirmed.*