[Civil No. 3451.   Filed April 1, 1935.]

[43 Pac. (2d) 518.]

GEORGE W. MILLER, ISABELLA C. MILLER, ALLEN E. WARE, JOHN ALLEN WARE, EDWIN E. WARE, LOUIS L. WALLACE and K. W. DAVIDSON, Appellants, v. THE ARIZONA BANK, a Corporation, and Y. C. WHITE, as Superintendent of Banks of the State of Arizona, et al., Appellees.

Mr. David P. Hatch and Mr. Louis L. Wallace, for Appellants.

Messrs. Moore & Shimmel, Mr. Arthur T. La Prade, Attorney General, and Mr. Riney B. Salmon, Assistant Attorney General, for Appellees the Arizona Bank and Y. C. White, Superintendent of Banks.

Messrs. Ellinwood & Ross, Mr. John Mason Ross, Mr. William H. Mackay and Mr. Norman S. Hull, for Appellees Northern Arizona Securities Company, Grand Canyon Sheep Company, Three V. Livestock Company, H. J. McClung, J. P. Wilson, George Kingdon, Ellen A. Brophy, J. S. Douglas, and First Securities Company, Ltd.

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellee Security First National Bank of Los Angeles.

Messrs. Chalmers, Fennemore & Nairn and Mr. O. C. Compton, for Appellee C. B. Wilson.

Messrs. Moeur & Moeur, for Appellee C. J. Walters.

Messrs. Clark & Clark, for Appellee Lulu H. Robinson.

LOCKWOOD, C. J.—George W. Miller, Isabella C. Miller, Allen E. Ware, John Allen Ware, Edwin E. Ware, Louis L. Wallace and K. W. Davidson, hereinafter called plaintiffs, brought suit against numerous defendants, whom we shall hereinafter refer to either generically as defendants or individually by name, in the superior court of Mohave county. Defendants Leo M. Meeker and First Securities Company, Ltd., were never served personally with summons and did not appear or answer in the proceeding, except that the latter filed a special appearance, and a motion to quash the summons which was never passed on. Defendant Lloyd Thomas, as Superintendent of Banks of the state of Arizona, filed a motion for a change of venue from Mohave to Maricopa county, on the ground that he was at the time of filing the complaint a public officer whose office was in Maricopa county. This motion was resisted by plaintiffs, but was asquiesced in by the codefendants of Thomas, and after consideration it was granted and the case removed to Maricopa county for further proceedings. Thereafter various motions, pleas and special and general demurrers to the complaint were filed by each of the defendants served, and were submitted to the court for its consideration. On July 17, 1933, the following order was entered in the minutes:

"It is hereby ordered sustaining the Demurrers and dismissing the complaint."

On the 3d day of August a proposed written judgment was served upon plaintiffs and on August 7th

they filed their objections to the form thereof, and a motion to vacate the decision and order of dismissal and reinstate the case, with leave to amend the complaint, and with said motion for leave to amend, filed a document entitled "amended and supplemental complaint." Thereafter and on September 15th the court denied the motion of plaintiffs to vacate the decision and order of dismissal, and for leave to amend the complaint, sustained part of the objections to the form of the judgment, and on the same day filed a written judgment, which after various recitals read as follows:

"It is hereby ordered, adjudged and decreed

"(1) That the defendants' demurrers to the plaintiffs' complaint herein on the grounds that said complaint does not state a cause of action against said defendants, or any of them, be and the same are hereby sustained;

"(2) That plaintiffs' complaint herein be dismissed;

"(3) That the said action be, and the same is, hereby dismissed.

"(4) That the defendants appearing herein, as aforesaid, do have and recover of and from the plaintiffs and each of them, their respective costs of suit necessarily incurred herein.

"Done in open court this 15 day of September, 1933.

"G. A. RODGERS,
"Judge of the Superior Court of the State of Arizona in and for the County of Maricopa."

Thereupon the following notice of appeal was given:

"Notice is hereby given that the above named plaintiffs appeal to the Supreme Court of the state of Arizona from the decision and order rendered, made, and entered in the above-entitled cause on the 17th day of July, 1933, dismissing the complaint, and from the whole thereof; and from that

certain order rendered, made, and entered on September 15, 1933, denying plaintiffs' motion to vacate decision and order of dismissal and reinstate said cause with leave to amend complaint, and from the whole thereof; and from that certain order rendered, made, and entered on September 15, 1933, granting in part and refusing in part the objections of plaintiffs to the proposed form of judgment submitted by defendants, and from the whole thereof; and from that certain purported judgment rendered, made, and entered on September 15, 1933, in favor of said defendants and against said plaintiffs, and from the whole thereof.''

And the appeal was duly perfected in proper form.

■■ It will be noted that the appeal by its terms was taken from four things: (a) the decision and order of July 17th; (b) the order of September 15th denying the motion to vacate the decision and order of dismissal, and to reinstate the cause with leave to amend; (c) the order of September 15th overruling part of plaintiffs' objection to the form of judgment; and (d) the judgment rendered and entered September 15, 1933. So far as the decision and order of July 17th is concerned, we think no appeal can be taken therefrom. The decision purports (1) to sustain the demurrers; and (2) to dismiss the complaint. This last would be a final judgment, but no written judgment of dismissal was filed at the time of the attempted dismissal, as provided by rule 7, Uniform Rules of the Superior Court. The attempted rendition of the judgment of dismissal was therefore void. *Gillespie Land & Irrigation Co.* v. *Hamilton,* 41 Ariz. 432, 18 Pac. (2d) 1111; *Chiricahua Ranches Co.* v. *State,* 44 Ariz. 559, 39 Pac. (2d) 640. While the order sustaining the demurrers was valid, it is not an appealable order. *City of Phoenix* v. *Jones et al.,* 21 Ariz. 432, 189 Pac. 242. We think, therefore, we are without jurisdiction to consider the first ground of appeal.

■ We discuss next the appeal from the order denying the motion to vacate the decision and order of dismissal, and to reinstate the cause with leave to amend, and the appeal from the order overruling part of plaintiffs' objections to the form of judgment. None of these orders are among those mentioned in section 3659, Revised Code 1928, from which alone an appeal can be taken. We therefore are without jurisdiction to consider separate appeals from any of them. Section 3658, Rev. Code 1928.

■ This brings us to the fourth matter appealed from, which is the judgment rendered on September 15, 1933. This is, of course, an appealable judgment, and the appeal brings before us all the orders from which we have held separate appeals could not be taken, except so far as they have been disposed of by what we have already said. Section 3660, Rev. Code 1928.

■ We proceed, therefore, to consider the ques-♦ tions raised by the appeal from the judgment, in such order and manner as we deem advisable for the sake of clarity and conciseness. The first is whether or not the order of the superior court of Mohave county changing the venue of the case to Maricopa county was erroneous. The motion was based on subdivision 16 of section 3715, Revided Code 1928, which reads as follows:

"16. Actions against public officers must be brought in the county in which the officer, or one of several officers, holds his office."

It is the contention of plaintiff that this subdivision does not apply to state officers, but to county officers only, and that since the defendant Thomas was sued as an officer and not individually, his personal residencè was immaterial. The statute is not by its terms limited to county officers, but applies to public

officers in general. Without doubt the superintendent of banks of the state of Arizona is a public officer of the executive branch of the state government, and holds his office at the state capitol in the city of Phoenix in Maricopa county, although he may from time to time perform various duties of the office in other counties. We are of the opinion that the change of venue was properly allowed, especially as none of his codefendants objected thereto.

█ Since the order of dismissal of July 17th was void, the case had never been dismissed and no order to reinstate was either necessary or proper, as on September 15th the legal status was that the general and special demurrers had been sustained, but no valid judgment rendered. The order denying the motion to vacate the decision and order of dismissal therefore was correct.

██ The question as to the right to amend a complaint after a demurrer is sustained has been before the courts many times. In states where the matter is not regulated by statute, it is very generally held that the filing of an amended complaint is within the discretion of the trial court, and its decision will not be reviewed except for an abuse of such discretion. This is the effect of most of the cases cited by defendants on this point. In Arizona, however, section 3740, Revised Code 1928, reads as follows:

"3740. Amendments. All pleadings may upon leave of the court be amended at any time, upon such terms as the court may prescribe, or the same may be amended without such leave, not less than five days before trial, by serving the adverse party with a copy of such amended pleading."

Plaintiffs contend that under this section they have an absolute right of amendment after the sustaining of a demurrer, and that the matter is not discretionary with the court. Whether the section applies to

cases where a general demurrer has been sustained, and the case therefore stands for judgment on the pleadings without a trial, we think need not be determined by us in this proceeding, for plaintiffs in their brief admitted that the proposed amendments were merely "to simplify the issues and proof and not to correct any defect in the original complaint."

If the plaintiffs, after a general demurrer is sustained, have an absolute right to file successive complaints in unlimited number, which are the same, in substance, as the one which was held demurrable, an intolerable situation would arise. We are satisfied that under any theory of the statute, if it appear that a complaint filed or offered after a demurrer is sustained is in substance merely a repetition of the one which has been held bad, it is not, within the meaning of the section, an "amended pleading," and the court may disregard it and proceed to judgment. We think, therefore, the court did not err in its order of September 15th denying leave to file an amended complaint which was, in all material substance, the same as the one to which both general and special demurrers had been sustained.

Nor do we think there is any merit in the objection to that order which overruled part of plaintiffs' objection to the form of judgment. The record taken as a whole shows that the effect of the judgment rendered was one of dismissal without prejudice after special and general demurrers to a complaint have been sustained, and in our opinion the form of the written judgment is proper, *if the judgment of dismissal itself was correct.*

We therefore come to the real issue in the case, which is whether or not either the special or the general demurrers should have been sustained. In order that we can discuss this question intelligently, it is necessary that we first summarize as briefly as

possible the allegations of the complaint. Stated in a narrative form they are substantially as follows: The Arizona Central Bank, hereinafter called the Bank, was a banking corporation, originally formed in 1895 under the territorial laws, with an authorized and paid-in capital stock of 200 shares of the par value of $100 each. The authorized capital stock was gradually increased until it became 10,000 shares, of which on December 18, 1930, there were issued and outstanding 5,000 shares of the total par value of $500,000. The defendants Grand Canyon Sheep Company, Three V Livestock Company and Colin Campbell Livestock Company are corporations engaged in the livestock business in northern Arizona, and we shall hereafter call them the livestock companies. On December 18, 1930, these three corporations were indebted to the Bank, the first in the sum of $150,000, the second in the sum of $131,000, and the third in the sum of $120,000, for money borrowed from the Bank, which debt was evidenced by the notes of the respective companies. The defendant First Securities Company, Ltd., hereinafter called the Company, is a corporation organized in 1920, which on December 18, 1930, owned substantially all the capital stock of the livestock companies. It also on the same date held in its name 3,740 of the total of 5,000 issued and outstanding shares of the Bank. The defendant Security-First National Bank of Los Angeles, which we shall hereafter call the Security Bank, is a national banking association with its principal business in California, although it is qualified also to do business in Arizona. On December 18th the Security Bank was the equitable owner of all the assets of the Company, and that bank and its officers therefore, substantially, though indirectly controlled and directed the management of all the companies and of the Arizona Bank. During all this time de-

fendant H. J. McClung was a stockholder and director and the general manager of the Company and the livestock companies and president of the Arizona Bank, and was also vice-president of the Security Bank. At the same time C. B. Wilson and C. J. Walters were also stockholders and directors of the Bank, defendant McClung, one E. A. Haight and one Martin Buggeln being the other directors thereof, while Ellen A. Brophy, George Kingdon, J. S. Douglas, J. P. Wilson and Lulu H. Robinson were stockholders in the Bank.

On the 24th day of November, and at all times subsequent thereto, the condition of the Bank was unsound and unsafe, and its capital impaired, and by reason of this condition it was reasonably probable that the livestock companies would be called upon to repay their loans to the Bank, and that all of the Bank's stockholders would be assessed and required to pay the sums for which they were liable by the charter of the Bank under such conditions. All of the defendants herein, except Lloyd Thomas, who was then state superintendent of banks, knew the condition of the Bank on November 24th, and at that time all of them except C. B. Wilson, Walters and Thomas conspired together for the purpose of enabling the livestock companies to escape the payments of their respective notes, and the various conspiring stockholders to dispose of their holdings of stock in the Bank for cash, and to escape any liability as stockholders if, as, and when the Bank was taken over by a receiver. In pursuance of said conspiracy they on November 24th procured defendant Leo M. Meeker to enter into a written agreement with the Securities Company whereby it would sell to Meeker 3,845 shares of the stock of the Bank at $180 per share, which was to be paid to the Company in the following manner, $1,000 in cash, a note

of Meeker for $100,000, secured by 1,275 shares of the stock so to be purchased, the notes of the livestock companies above described as owned by the Bank, which Meeker was to purchase from the Bank and turn over to the Company, a note of the Northern Arizona Securities Company in the sum of $88,500, and certain real estate held by the Bank, which Meeker agreed to have conveyed to the Company. The Company was to guarantee certain bonds, notes and securities held by the Bank to the amount of $275,000, and was to endeavor to procure a permit from the superintendent of banks of the state of Arizona for the reduction of the capital stock of the Bank to $250,000, the reduction of its surplus to $50,000, and its undivided profits to $20,000. It was also agreed by the conspiring defendants that Meeker should purchase 911 shares of the stock of the Bank outstanding in the names of the following defendants, to wit: Ellen A. Brophy, 363 shares; George Kingdon, 90 shares; J. S. Douglas, 273 shares; and Lulu H. Robinson, 185 shares, at the price of $140 per share, thus making a total of 4,756 out of the 5,000 shares of the Bank outstanding. Meeker at the time was without financial means or credit sufficient to enable him to make an actual *bona fide* purchase of these shares, which was well known to the conspiring defendants, and therefore as part of the conspiracy it was the intention and agreement that Meeker should secure $546,940 of the total purchase price by causing a reduction of the outstanding capital stock surplus and undivided profits of the Bank, and using the amount represented by such reduction in its liabilities to pay a pretended cash dividend of $115 per share, after the stock had been transferred to him.

On December 18, 1930, the stock owned by the conspirators, and agreed by them to be transferred to

Meeker, was transferred on the books of the Bank so that on that date he held 4,756 shares of the stock, the remaining 244 shares being held by defendants C. B. Wilson and C. J. Walters and certain other parties not defendants herein. It was necessary for the conspirators to secure the approval of the board of directors of the Bank to various acts necessary to be done to carry out the conspiracy, so on that date C. B. Wilson and C. J. Walters and E. A. Haight were informed of the situation and the purposes of the conspiracy, and they joined and entered into it. In furtherance of the conspiracy McClung, acting for the Northern Securities Company, made its note to the Bank for $88,500 and received in exchange for said note cash from the Bank. Thereupon a special meeting of the board of directors of the Bank was held, there being present and participating McClung, Walters, Haight and C. B. Wilson, and McClung resigned, Meeker being elected as director and president in his place. A resolution was adopted authorizing the conveyance of the real estate to the Bank, which was to be conveyed under the agreement above set forth to the Company, and the directors adjourned.

A permit for the reduction of capital stock and surplus had been obtained from the superintendent of banks, but no such reduction was made in the manner provided by law. Instead a meeting of the stockholders of the Bank was held, without call or notice, at which all of the capital stock outstanding at that time was represented, and a resolution was adopted, reducing the capital stock and surplus, and declaring a cash dividend as the result of such reduction in the sum of $115 per share upon the original 5,000 shares outstanding, thus withdrawing $575,000 cash from the assets of the Bank.

In pursuance of this action of the stockholders' meeting, all certificates evidencing the outstanding capital stock were presented to the Bank and canceled and new certificates were issued to the then stockholders in the proportion of one share of new for each two shares of old stock so canceled, and the dividend, as above stated, was paid. Immediately thereafter Meeker used the money which he had so received as a dividend to pay off the notes of the livestock companies and Northern Arizona Securities Company, and to pay the Bank for the real estate transferred by it as aforesaid, the total amount so paid amounting to $516,100, and the notes were thereupon canceled and delivered to the makers. In furtherance of the conspiracy Meeker had negotiated numerous sales of stock, amounting altogether to 954 shares at a total price of $133,760, which was duly paid for in cash, the majority of such purchasers having paid for their stock before the attempted reduction of the capital, surplus and undivided profits, and in ignorance of such reduction and the withdrawal of the $575,000 from the assets of the Bank as a result thereof, and from the proceeds of the sales so made Meeker paid to defendants Brophy, Kingdon, Douglas and Robinson the sum of $140 per share for the stock he had bought from them, and each of them accepted the money with full knowledge of the conspiracy and fraudulent acts alleged in the complaint.

For a number of years prior to December 18, 1930, and continually thereafter until the Bank was closed by the superintendent of banks, plaintiffs George W. Miller, Allen E. Ware, Louis L. Wallace and K. W. Davidson were customers of and depositors in the Bank, having full confidence and belief that the same was in a perfectly sound condition and not having any knowledge of the contemplated reduction of the

capital stock and surplus, or of the intended withdrawal of the $575,000 from the assets of the Bank.

A short time before December 18, 1930, Walters, acting on behalf of the conspiring defendants, and in furtherance of the conspiracy, and knowing the situation and belief of the last named plaintiffs in regard to the notes of the Bank, and concealing from them the true facts which he knew in regard to all of the transactions above set forth, and with intent on his part to defraud the plaintiffs and cause them to lose large sums of money, solicited them to become stockholders in the Bank, representing to each of said plaintiffs separately that it was the desire of the Bank to have such plaintiff own some of its stock, that such connection with the Bank would be of benefit to him, and that the money which he paid would be used to increase the capital stock of the Bank. The plaintiffs believed these representations and relied upon them and were thereby induced to and did purchase some of the stock of the Bank, Miller, 80 shares; Ware, 50 shares; Wallace, 15 shares; and Davidson, 25 shares, and paid for the same in cash, $150 per share. After the reduction of the capital stock and surplus as above, the defendant caused to be issued to the plaintiffs from Meeker's holdings of stock, in their reduced amount, certificates for the stock so purchased by them. By reason of the withdrawal of the $575,000, as aforesaid, the capital of the Bank was further impaired, and it was ever after such withdrawal insolvent, in the sense that it did not have enough assets to pay within a reasonable time or at any time all its liabilities, and the shares of stock delivered to the plaintiffs, as above, therefore had no value whatever. The statements made severally to the plaintiffs that a connection with the Bank would be a benefit to the plaintiff and that the money received would be used

to increase the capital stock of the Bank were false, and at the time they were made were known by said conspiring defendants to be false and untrue, and as a matter of fact instead of being a benefit such stock was a possible liability to plaintiffs for an assessment to meet the debts of the Bank, and the money paid for the stock was not used to increase the stock of the Bank, but was converted to the personal uses of the conspiring defendants.

On or about January 26, 1931, the name of the Arizona Central Bank was changed to The Arizona Bank and all the certificates of stock were exchanged in accordance with the change of name. Thereafter various portions of the stock so sold the already named plaintiffs were by them transferred to the other plaintiffs, none of whom had any knowledge of the actual situation above set forth. Plaintiffs for the first time realized that the Bank was insolvent on June 24, 1932, when it was closed by the superintendent of banks, and it was not until the latter brought suit in the superior court of Maricopa county against certain of the defendants in the present suit, charging them with the conspiracy to defraud the Bank and its creditors, that the plaintiffs realized the true situation. As soon as they discovered enough of the facts to warrant the filing of an action, which was in October, 1932, each plaintiff elected to and did disaffirm and rescind the contract of purchase of stock made by him and gave notice of such rescission to the defendants who sold them their stock, and tendered back to the defendants such stock and demanded that they pay back to plaintiffs the amount which plaintiffs had paid for the stock and caused them to be relieved of any stockholder's liability, but the defendants refused to accept the shares, or return the money or discharge the liability.

It is then alleged that by reason of the conspiracy plaintiffs have suffered damage already in the amount of the purchase price of the stock owned by them, and that defendant Thomas has levied an assessment of the full par value of their stock against all stockholders in the Bank and has demanded from plaintiffs the payment of such assessment and threatens to sue them therefor.

It is next alleged that they joined in the present action for the purpose of preventing a multiplicity of suits and adjusting their rights with all of the defendants; that they have no adequate remedy at law and that complete relief can only be administered through a court of equity.

The prayer for relief is (a) that the contracts whereby the plaintiffs purchased their stock be declared rescinded and void and the shares delivered to the sellers or whoever may be entitled thereto; (b) that the amounts plaintiffs were induced to pay be adjudged an indebtedness of the defendants, and each of them, who sold the same, and judgment be rendered therefor against each of the defendants who sold the same, and against all other defendants who participated in the conspiracy as damages for their conduct; (c) that the attempt to reduce the stock of the Bank be declared illegal and of no effect, and the certificates of stock issued in the name of plaintiffs null and void, and that the latter be declared not liable thereon as stockholders, or, in the alternative, that if under the law they are liable as stockholders, that the amount for which they are so liable be decreed an indebtedness of the defendants who sold the stock, and that the latter be compelled to pay the superintendent of banks such liability directly, or if such payment cannot be compelled, that plaintiffs may have judgment against the conspiring defendants for whatever amount they are compelled to pay on

account of their stockholder's liability, as damages for the fraudulent conduct of defendants, and that the superintendent of banks be enjoined from suing plaintiffs on their stockholder's liability until this suit is determined.

We consider first the special demurrers. There are many of them presented by the different defendants, but they may be grouped in three classes which set up that there is a misjoinder of causes of action in that it is attempted to unite (a) actions seeking a rescission of separate contracts of purchase of the stock of the Bank, and actions seeking to recover damages by reason of fraudulent representations made to induce the purchase of the stock; (b) separate and distinct actions by several plaintiffs, each seeking to recover damages by reason of fraudulent representations made to them separately and individually to induce the purchase of stock; (c) separate and distinct actions by several plaintiffs, each seeking to rescind separate and distinct purchases of stock on the ground of fraudulent representations made to them separately and individually to induce them to purchase said stock.

It is necessary, therefore, for us to determine just what the nature of the action is. Counsel have spent a considerable portion of their briefs in discussing this question, but we think it may be answered by a consideration of certain elementary principles. The complaint is voluminous, but it shows clearly and positively that plaintiffs base their claim to any recovery whatever against the defendants, or any of them, on the theory that they were induced to enter into and complete certain contracts of purchase and sale of the stock of the Bank by reason of false and fraudulent representations made to them by one of the defendants at the instance of the others. It is the unquestioned law that when a party

has been induced to enter into a contract by the means of false and fraudulent representations, he may upon the discovery of the fraud either affirm the contract and sue for damages, or he may repudiate the contract, tender back what he has received under it, and recover what he has parted with. 13 C. J., pp. 395 and 611 and notes. He cannot, however, do both, and the adoption of one remedy excludes the other, for the reason that they are inconsistent and contradictory, one being based on the affirmance of the contract, and the other on its repudiation. *Dowdy* v. *Calvi,* 14 Ariz. 148, 125 Pac. 873; *Roome* v. *Jennings,* 21 N. Y. Supp. 938, 2 Misc. 257.

It is obvious to us that the whole theory of the complaint is based upon a repudiation of the contract and not upon its affirmance, and since such is the case, even though many portions thereof could and should have been stricken as immaterial, we are of the opinion that it is clearly a suit in equity for rescission and not an action at law for damages for deceit. We hold, therefore, that there was not in this action an improper joinder of actions for rescission with actions for damages for deceit, but that the complaint attempts to state an action in rescission only, and that the demurrers on the ground of an improper joinder of two kinds of actions should have been overruled.

We consider next the special demurrer on the ground that there was an improper joinder of causes of action in that it was sought to unite separate causes of action in favor of several parties plaintiff. What were the allegations of the complaint in regard to the alleged false and fraudulent representations? They read, in substance, as follows:

"Prior to December 18, 1930, defendants C. J. Walters, vice-president and one of the directors of

the Arizona Bank and manager of its branch at Kingman, Arizona, where said plaintiffs . . . had their said accounts, . . . solicited said . . . plaintiffs to purchase some shares of stock of said bank and become stockholders, and represented to *each of said plaintiffs severally* that it was the desire of The Arizona Bank to have him own its stock and have his name connected with it, that his connection with the bank would be a benefit to him and the money procured from the sale of the stock would be used to increase the capital of said bank; and said plaintiffs believed each and all of said representations to be true and relied upon the same; and, so believing and relying and acting in ignorance of the unsound and unsafe condition of said bank and in ignorance of said contemplated reduction of its capital, surplus and undivided profits and withdrawal of its funds, each of said plaintiffs was induced to purchase some of the stock of The Arizona Bank and did purchase the number of shares following their respective names: . . . '' (Italics ours.)

The portion of the complaint just quoted stated emphatically that whatever the representations were that induced plaintiffs to purchase the stock in the Bank, they were made to them separately and severally, and not jointly or as a class. The general rule of law is that actions for fraud are purely personal in character and when the parties defrauded were dealt with separately and acted separately there are as many wrongs as there are persons wronged. Under such circumstances the actions should be brought separately, unless they fall within one of the exceptions authorizing a joinder of causes of action. It is the contention of plaintiffs that they are within the exception referred to in Pomeroy's Equity Jurisprudence, third edition, page 445. Therein the writer says that equity jurisdiction to prevent a multiplicity of suits: ''may and should be exercised, either on behalf of a numerous body of separate claimants against a single party, or on behalf of a

single party against such a numerous body, although there is no 'common title,' nor 'community of right' or of 'interest in the subject matter,' among these individuals, but where there is, and because there is, merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body. . . . Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy.''

The most that is said by the complaint in regard to plaintiffs' unity of interest is that each plaintiff possesses a cause of action against the seller, arising from representations which were of the same nature, but which were made to them separately and severally.

Upon facts much like those of the present case, there are some courts which hold that plaintiffs may join. *Wilkinson* v. *Heberling,* 231 Ill. App. 516; *Bosher* v. *Richmond & H. Land Co.,* 89 Va. 455, 16 S. E. 360, 37 Am. St. Rep. 879; *Hamilton* v. *American Hulled Bean Co., Ltd., et al.,* 143 Mich. 277, 106 N. W. 731; *Reardon* v. *Dickinson,* 156 La. 556, 100 So. 715; *Rader* v. *Bristol Land Co.,* 94 Va. 766, 27 S. E. 590. On examining these cases it will be found that all or nearly all have certain matters in common: (a) they cite the statement above quoted from Professor Pomeroy, either directly or indirectly, as authority for their position; (b) the alleged fraudulent representation was the same to all the plaintiffs; (c) it is either directly stated or inferred that proof of a case

in favor of one plaintiff will necessarily require a judgment in favor of all; (d) the reasons given for allowing the joinder are that the expense and time of trying many separate cases will be avoided, and the defendant will not be hampered or prejudiced in his defense thereby.

The majority of the courts, however, do not take the view of the cases just cited. Probably one of the best reasoned of these cases is that of *Noroian* v. *Bennett,* 179 Cal. 806, 179 Pac. 158, wherein the court discusses the rule laid down by Professor Pomeroy and points out that the courts holding that a joinder may be had have extended the general statement made by that distinguished writer to govern a class of cases to which he evidently did not refer. We quote therefrom as follows:

"The plaintiffs base their claim that the law allows a case of this kind, upon the statement of Professor Pomeroy . . . (quoting from 3 Pom. Eq. Jur., 3d ed., section 269, page 445):

"These passages illustrate the difficulty of stating a legal principle in abstract terms without a concrete illustration to show their application. In speaking of 'a community of interest' in the questions of law. and fact involved, the author was referring to cases where a *single fact was decisive of the claim of all the parties concerned,* as where persons owning separate rights in the waters of a stream are injured by a diversion of the water higher up on the stream, . . .

"It is clear, from a consideration of the facts alleged in the complaint, that the present case is not included in any of the classes to which the rule stated by Mr. Pomeroy is applicable. There is no single fact or act, the determination of which will determine the rights of all the plaintiffs. There is no community of interest between the plaintiffs in the facts which are involved in the several actions on the promissory notes mentioned in the complaint, or in the defenses to such actions. Each plaintiff

has a cause of action, though imperfectly alleged, to cancel a promissory note on the ground that the same was procured by fraud. The causes of action so far are similar. But the facts in the several cases are not shown to be the same, nor capable of proof by the same evidence. The promise made without intention of performance was not a single promise made to all the plaintiffs. Separate promises were made to each of them, and at different times. The proof of each promise must of necessity be distinct, independent, not determinative of any other. To constitute such fraud the party must have relied on the promise made to him, and must have been induced thereby to enter into the contract. Such reliance and inducement would be the subject of independent proof and contradiction as to each plaintiff. One may have been persuaded by one statement, by a look, tone, or gesture, and another by something entirely different, and so there might be required different proof as to the means of persuasion of each of the 20 plaintiffs. The trial of the facts with respect to each note would not be an endeavor to prove a single act of the Rochdale Company as a common cause of a separate injury to each of the plaintiffs, as in the cases to which the doctrine of Mr. Pomeroy is addressed, but would be the proof of a separate injury to each plaintiff by evidence relating to him alone, and requiring a determination of the fact with respect to him alone. The trial of this joint action would require 20 different trials respecting 20 different conditions, to determine the facts upon which the rights of 20 different persons would depend, and neither trial would be a determination of the rights of any of the others. There is no case to which Mr. Pomeroy refers, nor any in the books so far as we have been advised, to justify the exercise of this jurisdiction in cases of this character. It may be that the same principles of law would govern the decision in all of the cases. This might be said of any number of cases of similar character, whether between the same persons or not. But there is no case which holds that parties having separate causes of action against the same person, all claiming under the same rules of law, have a common interest which

justifies the joinder of all in one action to obtain the separate relief to which they may be entitled. We are of the opinion that the complaint did not state facts sufficient to constitute a cause of action in favor of all of the plaintiffs, but that at most it merely stated 20 separate and distinct causes of action, each in favor of a different plaintiff, and that it presents no sufficient ground for joining them all in one action.

"The judgment is reversed." (Italics ours.)

See, also, *Dunn* v. *Arbuckle,* 113 Kan. 169, 213 Pac. 655; *Creer* v. *Bancroft L. & I. Co.,* 13 Idaho 407, 90 Pac. 228; *Rural Credit Subscribers Assn.* v. *Jett,* 205 Ky. 604, 266 S. W. 240; *Bradley* v. *Bradley,* 165 N. Y. 183, 58 N. E. 887; *Wheeler* v. *Gleason,* 70 N. Y. Supp. 381, 34 Misc. 604; *Chester* v. *Halliard,* 36 N. J. Eq. 313.

On a careful examination and analysis of all of the cases cited on this point by both plaintiffs and defendants, together with others of the same tenor, we are of the opinion it is quite clear they represent opposing positions in a conflict arising from a desire to carry out two different purposes, which under some circumstances may be harmonized and under others are incompatible. It is obviously in the interest of justice that all litigation should be conducted as expeditiously, and with as little unnecessary expense to the different parties as may be. But it is of vital importance that controversies between parties should be settled on the merits of the particular controversy, and that the triers of fact should not be influenced in any manner by extraneous and irrelevant matters. At times both of these principles may be applied successfully in a single case, and under such circumstances a joinder of separate causes of action is justified. But at other times it is impossible to do complete justice to litigants and still to minimize expense and time by such a joinder. In these latter

circumstances the course followed will be determined by the opinion of the particular court as to which principle is of the most importance. In the cases cited by plaintiffs on the question now before us, it is obvious that the courts which upheld the right of joinder either ignored or minimized the danger of a confusion of issues, and emphasized the necessity of the avoidance of a multiplicity of actions which, of course, would mean an increased expenditure of both time and money.

In those cases cited by the defendants it is apparent that the courts which denied the right of joinder, while recognizing the advantages of preventing a multiplicity of actions, felt the danger of injustice resulting from a confusion of issues in the minds of the triers of fact outweighed the mere saving of time and money.

It might be urged that the question of allowing a joinder of causes of action should be left to the sound discretion of the trial court, based on its conclusion as to which rule in the particular case would come the nearest to doing abstract justice. This, however, would be most dangerous, for experience proves that uncertainty in the law is generally more harmful to the public in the long run than an occasional inconvenience in a particular case, and while an exercise of discretion may be permitted the trial court in matters of procedure affecting the trial only, without serious results, when such discretion is extended to the right of action itself, more evil ·than good would result therefrom.

We are therefore forced to decide whether on the whole in cases of this nature justice will be better served by allowing or denying a joinder of independent causes of action of different parties plaintiff. We are of the opinion that it is more important that cases should be so brought and tried that the triers

of fact will not be confused by matters extraneous to the true issue, than that the plaintiffs should be saved a little time and expense. We therefore hold that the true test to be applied in cases of this kind is, "Can proof of the vital fact necessary to establish the right of one plaintiff be made by the same evidence which is necessary to establish a corresponding right in each of the other plaintiffs?" Applying this test to the present action, we think it plain that the action does not meet it. The vital issue which determines the right of each separate plaintiff is whether or not representations fraudulent in the eyes of the law were made to him, which induced him to purchase the stock in question. The complaint shows that the representations were several and separate and not joint. Such being the case, evidence which proves actionable misrepresentations to one plaintiff and a reliance thereon cannot prove actionable representations to another plaintiff, and a reliance thereon by him. A perfect case might be made in favor of one plaintiff, and the other might utterly fail. It may be contended that the complaint alleges that the representations made were identical in character. This may be true, but they were alleged to have been made severally, and the proof necessary to establish them in one case is thus necessarily different from that necessary to establish them in the others. We are of the opinion, for the reasons stated, that the trial court properly sustained the special demurrer on the ground that several causes of action in different parties plaintiff were improperly united in one case. This being true, and plaintiffs making no attempt to file an amended complaint which would meet the defect complained of, the trial court properly rendered judgment dismissing the action.

It is true that the judgment on its face does not say that the special demurrers were sustained, and that the order of dismissal was based thereon, but states that the general demurrer to the effect that the complaint did not state a cause of action was sustained. The minute entry of July 17th, however, shows affirmatively that all of the demurrers were sustained, which includes the special demurrer, which we have discussed. It is the law that if it appears from the record as a whole that the final judgment was the only one which could be rendered, it is immaterial whether the court based it on the proper ground or not. *Harper* v. *Independence Dev. Co.,* 13 Ariz. 176, 108 Pac. 701; *Crook* v. *Crook,* 19 Ariz. 448, 170 Pac. 280; *Tevis et al.* v. *Ryan,* 13 Ariz. 120, 108 Pac. 461; affirmed 233 U. S. 273, 34 Sup. Ct. 481, 58 L. Ed. 957. Since under the facts stated in the record a judgment of dismissal was necessary on the sustaining of the special demurrer, we need not consider whether the general demurrer also should have been sustained.

We regret the necessity of this conclusion. If the matters set forth in the complaint are true, it is evident to us that a grievous injustice has been done the plaintiffs by someone, and they should be permitted an opportunity to present their respective claims on the merits, so that it may be determined whether or not what they have stated is true. We cannot, however, in order to aid them to do this, lay down a general principle of law which would, in our opinion, in the long run do more harm to litigants in general than would be compensated by the immediate saving of time and money it might perhaps permit plaintiffs. The latter, however, still have available to them an opportunity to determine whether or not they have been deprived of any legal rights by defendants, or any of them. Their whole claim is

based upon the theory of fraudulent representations which were not discovered by them until October, 1932. Under our law the statute of limitations does not run against such actions for three years from the discovery of the fraud. Section 2060, Revised Code 1928. The whole record in this case shows that the dismissal of the action was without prejudice, for the trial court struck from the judgment submitted to it by defendants for approval recitals of a dismissal with prejudice. Plaintiffs may therefore still severally file actions for relief, and if their pleadings and proof entitle them thereto, will be fully compensated, so far as the law can do it, from any wrong which may have been done to them.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER and ROSS, JJ., concur.