(100 South. 715)

No. 26277.

REARDON et al. v. DICKINSON et al.

(May 5, 1924. Rehearing Denied by the Whole Court June 20, 1924.)

(*Syllabus by Editorial Staff.*)

1. Parties ⬤—14, 25—Test in determining misjoinder of parties.

Test to be applied in considering a plea of misjoinder is whether the parties, plaintiffs or defendants, have a common interest in subject-matter of suit.

2. Parties ⬤—75(9)—Exception of misjoinder dilatory, and necessarily determined on face of petition.

Exception of misjoinder of parties is dilatory in character, and must necessarily be determined on face of petition.

3. Corporations ⬤—80(12) — Subscribers to stock held entitled to join as plaintiffs to recover purchase price.

Subscribers to corporate stock were entitled to join as plaintiffs in action to recover price paid for stock though each plaintiff entered into separate contract, and no one had any interest in shares acquired by others; all plaintiffs being induced to subscribe for stock on false representations of common agent though representations were not made to plaintiffs collectively.

4. Parties ⬤—14—Joinder matter of discretion.

Matter of permitting number having common interest to join as plaintiffs in action rests within sound discretion of trial judge.

5. Limitation of actions ⬤—100(6)—Prescription; statute starts to run after discovery of fraud.

Action to recover price paid for corporate stock for fraudulent representations is not barred by Civ. Code, art. 3536, within one year after making of false representations, but may be maintained within year after discovery of fraud and actual loss and damage.

6. Corporations ⬤—30(2) — Defendant held connected with promotion and liable for fraud of agent selling stock.

Evidence *held* to show that defendant ratified signature to corporate charter so as to be liable in action by subscribers to stock to recover purchase price on ground of fraud of agent of promoters.

**7. Corporations ⬦�ネ30(2)—One interested in promotion of corporation held liable for fraud in sale of stock.**

One who was not original subscriber for stock, and did not sign charter, but agreed to take stock, wrote letters introducing agent as representative of concern, and participating actively in affairs of corporations, *held* liable for fraud of agent of corporation in sale of stock.

Appeal from First Judicial District Court, Parish of Caddo; J. H. Stephens, Judge.

Suit by R. M. Reardon and others against W. L. Dickinson and others. Judgment for plaintiffs, and certain defendants appeal, and file plea of prescription. Affirmed.

Thigpen, Herold, Lee & Cousin, of Shreveport, for appellants.

Wise, Randolph, Rendall & Freyer, of Shreveport, for appellees.

By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.

THOMPSON, J. The 20 plaintiffs instituted this suit against the 4 defendants, praying for judgment in solido for $35,000 apportioned to the plaintiffs as set out in the petition, this being the amount paid by the plaintiffs for 35,000 shares of the capital stock of the North Louisiana Drilling Company at the par value of $1 per share.

The liability of the defendants is predicated upon the fact that the plaintiffs were induced to subscribe for the said stock by the false and fraudulent representations of one J. E. P. Miller, the duly authorized agent of the defendants, who were the promoters and organizers of the said corporation, and which stock, as shown by subsequent events, was utterly worthless.

An exception of misjoinder of parties plaintiff was filed by all of the defendants except Wakefield.

The exception having been overruled, two of the defendants, Jake Metzler and Arthur T. Kahn, answered. Metzler denied having had any connection with the promotion or organization of the corporation, and denied that he was a subscriber to the charter, or that he owned any stock in said corporation.

Kahn denied that he was a subscriber to any stock, but admitted that 300 shares had been issued to and accepted by him in payment of $300 which he had loaned to the company. He alleged that his name had been signed to the charter without his authorization, and that he was not responsible for any of the acts or representations of the agent or of the promoters and organizers of said corporation.

After trial on the merits judgment was rendered in favor of the several plaintiffs for the amount sued for against Dickinson, Metzler, and Kahn. The two last named have appealed, and in this court have filed a plea of prescription of one year under article 3536 of the Civil Code in bar of plaintiff's action.

### Misjoinder.

[1] The exception of misjoinder is founded on the hypothesis that there exists no mutuality or privity of interest between the several plaintiffs with respect to the relief demanded by them individually. In other words, it is argued that each of the plaintiffs entered into a separate contract by which he became a subscriber and purchaser of a certain number of shares of stock, and that no one subscriber has any interest in the shares acquired by other subscribers. This is unquestionably true, but because of such want of interest and such diverse ownership it does not follow that the plaintiffs cannot all legally join in one suit. The test to be applied in considering a plea of misjoinder is whether the parties, plaintiffs or defendants, have a common interest in the subject-matter of the suit.

[2, 3] The exception of misjoinder is dilatory in character and must necessarily be determined on the face of the petition. It appears from the allegations that the de-

fendants agreed that they would organize a corporation with an authorized capital stock of $300,000; that they would sell $200,000, and for their services in promoting, organizing, and financing the said corporation they would receive and divide among themselves the other $100,000 of the capital stock. A charter was prepared and was signed by Dickinson, Wakefield, and Kahn, the last-named subscriber being represented by Dickinson as agent. Each incorporator subscribed for $100,000.

The charter was filed with the Secretary of State and was duly published. An agent was employed and sent forth to solicit subscriptions. He visited the cities of Dallas and St. Louis with letters of introduction, and immediately got in touch with certain friends and business acquaintances of his principals. Among them were the plaintiffs named in the petition. The said agent in person and through others represented to the several plaintiffs that $100,000 in cash had already been paid into said company and was in the treasury; that many reputable and prominent citizens of Shreveport had invested their money in said company, and were stockholders; that a trusted employé of long service with the Standard Oil Company was the manager and in charge of the operations; that E. K. Smith, president of the Commercial National Bank of Shreveport, had invested money in said corporation; and that others who were oil producers and contractors of Tulsa, Okl., were owners of stock in said company. Acting upon these representations, and knowing the people referred to in a business way, the plaintiffs subscribed and paid for the amount of stock as set forth in the petition.

It is charged that all of the representations made by the said agent of defendants were misleading and were false in every particular. Not one penny had been paid into said corporation, and none of the stock had been subscribed to except by the three incorporators, who never intended to pay for the same. None of the persons who were represented as owning stock in said company had any interest therein. The plaintiffs paid in the sum of $42,500, which represented practically all of the capital stock issued or paid for.

From the foregoing recited facts it is apparent that all of the plaintiffs were moved and induced to subscribe for the stock of the corporation on the false and misleading representations of the common agent of the promoters and organizers of the corporation, and it follows as a corollary that all of them have an interest in common with each other to recover the amounts which each of them paid out on such fraudulent representations. It can make no difference whether the representations were made to the plaintiffs individually or collectively, at one time and place or at different times and places. It suffices for the purposes of this case that the representations were the same to each of the plaintiffs, and that each acted on such representations. The cause of action of each of the plaintiffs, therefore, has the same origin and arises from the same common source. The evidence necessary to sustain the demand of one will be required for all the others. If one of the plaintiffs is entitled to recover, then all of them are. The plaintiffs must all succeed or all fail. There is no controversy as to the amount due each plaintiff. There is no antagonism between the plaintiffs. The certificates of stock are annexed to the petition and speak for themselves. The defendants cannot question the legality of the stock purchased by the plaintiffs, nor can the corporation do so.

The only issue presented, therefore, between the plaintiffs and the defendants, is the alleged artifice and fraud practiced on the plaintiffs by the agent of the defendants. There has been no sufficient reason

suggested, and none can be suggested, why there should be as many separate trials of that single issue as there are plaintiffs in this suit. In Gill v. City of Lake Charles, 119 La. 17, 43 South. 897, Mr. Justice Provosty commented on the fact that the Code of Practice makes no provision for determining when parties may or may not be joined either as plaintiffs or defendants; and after a review of many authorities he said:

"We have to be guided in that regard by the well-settled rules of pleading as found in the books of common law, according to which a large discretion is left to the court; the aim being to avoid a multiplicity of suits, while not permitting parties to be joined who have not a common interest. * * *"

And this appears to be the rule followed in all of the cases we have been able to find. Where there is a common interest in the subject-matter of the suit, and where the cause of action arises from the same common source, joinder will be permitted; otherwise it will not. Holzab v. R. Co., 38 La. Ann. 187, 58 Am. Rep. 177; Cane v. Sewall, 34 La. Ann. 1096; Conery v. Coons, 33 La. Ann. 373; Riggs & Bro. v. Bell, 39 La. Ann. 1031, 3 South. 183.

[4] After all, the matter was within the sound discretion of the trial judge, and we are unable to say that he has abused that discretion. There is no pretense that the defendants have suffered any injury by the ruling complained of.

### Prescription.

[5] The plea of prescription is manifestly untenable under the facts of this case. The petition alleges and the evidence establishes that the plaintiffs did not discover that a fraud had been practiced on them until May, 1920, and the suit was filed in less than a year thereafter. As a matter of fact, while the false representations were made and the stock was issued to the plaintiffs more than a year before the suit was filed, the actual loss and damage only occurred within the year preceding the filing of the suit.

In Mestier v. New Orleans O. & G. W. R. Co., 16 La. Ann. 354, the court said:

"It seems to the court to be quite clear that the article 3502 [now 3537] C. C., should be construed (in such cases) as it reads, and the prescription should be held to commence running from the time the damage was sustained."

The foregoing ruling was made after mentioning the following example:

"My neighbor willfully undermines the party wall between us without my knowledge, and a year afterwards it falls. Shall he escape by proving that he did the act which occasioned the damage more than a year previously?"

The answer given by the court to the query must be the same in the instant case. See, also, Hotard v. T. & P. Ry. Co., 36 La. Ann. 450. Moreover, the letters of the defendants to a number of the stockholders and to the plaintiffs kept them from being informed of the true conditions under which the corporation was organized and the stock issued to the plaintiffs.

The defendants should not be permitted to profit by their own wrong and to shield themselves by the pleaded prescription.

"A further exception must be recognized, we think, in a case like the present, where the inability of the plaintiff to act was brought about by the practices of the defendants. Otherwise the defendants would be profiting by their own wrong—a thing inadmissible in law." Hyman v. Hibernia B. & T. Co., 139 La. 417, 71 South. 600.

### On the Merits.

[6] It is unnecessary to review the evidence on the question of the fraudulent representations of Miller, the agent. Counsel for appellants frankly admit in their brief that the plaintiffs were swindled out of their money. They say on page 13 of their brief:

"There is no doubt that plaintiffs bought stock through misrepresentation, when they would not have bought it had they known the true facts. This is fully proved by the testimony of plaintiffs."

And on page 27 of their brief counsel say: "It is clear that plaintiffs have lost money, * * *" etc.

The only question to be considered, therefore, is, whether the relation of the two appellants with the promotion of the corporation and their activities in connection with the organization of the corporation were such as to make them legally liable for the consequences of the fraud practiced on the plaintiffs and for the loss sustained as a result of that fraud.

The agent who negotiated the sale of the stock soon thereafter absconded. Wakefield, one of the active promoters and a subscriber for one-third of the capital stock, could not be found, or was not served. Dickinson went into voluntary bankruptcy. The other two allege in their answer and testified on the trial that they had no connection with the company, either as promoters or organizers; that they did not subscribe for any of the stock, nor did they sign the charter. The evidence in the record does not sustain their contention.

It is true that Mr. Kahn did not specially authorize Dickinson to sign his name to the charter, but his conduct and his acceptance of an official position with the corporation, and the aid and assistance rendered in furtherance of the promotion and organization of the corporation, were such as to amount in law to a ratification of the act of Dickinson in affixing his name to the charter, at least to the extent of making him liable for the acts of the agent of the promoters and organizers of the corporation, even though he could not be held to the payment of the subscription to the stock, a question we are not called on presently to consider.

He was named in the charter as a director and treasurer; he accepted and acted in that capacity. He could not be a director without being a stockholder. The charter was placed on record in the office of the Secretary of State and was duly published. He was informed of these facts and of the fact that his name was affixed to the charter as a subscriber for one-third of the capital stock very soon thereafter, and he took no steps, so far as the public was concerned, to repudiate the acts of his ostensible agent. His protest made to his confidential legal adviser and to the president of the corporation with whom he was actively colaboring in furthering the interests of the company could not in law or in fact be regarded as a repudiation of the agent's act. He was present and participated in the first conference at which the organization of the corporation was proposed. At that meeting it was agreed that the company should be chartered and that Dickinson should be named president, Wakefield vice president and secretary, and Kahn treasurer. It was also agreed that Miller and Wakefield should be named as solicitors of stock on the amount of which they were to receive 10 per cent.

In a letter to Mr. Hoffman, one of the subscribers, on January 17, 1920, Mr. Kahn wrote stating that he was treasurer, and in his opinion the company was a very good one, adding:

"I think in the next few days we will have a meeting of the officers and have things up in good shape."

And on February 28, 1920, he wrote to Mr. Brookmire, who, on the representations of Miller, had been instrumental in getting the plaintiffs to take the stock:

"* * * That immediately upon Mr. Wakefield's return as soon as we could get together we found it necessary to change secretaries, and we did so, and Mr. Wakefield is no longer connected with the company."

On March 6, 1920, he wrote Brookmire as follows:

"I am informed by the secretary of the company that $75,000 is paid in, and they are expecting within the next few days to get in about $50,000, making $125,000, and that it is the in-

tention of Mr. Dickinson and the other officers to sell more of the stock, but have been in no hurry to do so as they wish to place it in the hands of the proper parties."

On March 20, 1920, Kahn wrote to Mr. Adams, a stockholder:

"A meeting was had Thursday with Messrs. Metzler, Dickinson and myself, and we went over the matters carefully and from what I can ascertain, we expect about the 15th of April to show a profit of from $10,000 to $12,000 which will absorb all organization expenses and expenses incurred in handling the business. If at that time, the business does not show up as we think it should, it is the present intention of the three of us (Dickinson, Metzler, and Kahn) to liquidate the company and to return to each stockholder the amount of his subscription.

"I am frank to state that when this company was organized it was not properly managed but as soon as we discovered this we made a change and we are of the opinion that the stockholders will not suffer any loss whatever.

"I personally, also Mr. Metzler and Mr. Dickinson, have stated they would rather suffer a loss than to have the stockholders lose money, and would reimburse them before they should suffer a loss."

On April 15 Kahn again writes:

"Both Mr. Metzler and the writer are urging upon Mr. Dickinson the importance of this [referring to Dickinson's contemplated visit to St. Louis to see the complaining subscribers] as we are very anxious to have him interview the St. Louis stockholders and to go into matters fully with them."

Before Dickinson went to St. Louis there was a conference with his associates, Metzler and Kahn, in which it was agreed that Dickinson should visit these stockholders and endeavor to satisfy them and to adjust their claims. As a result of this conference Dickinson did go to St. Louis, but effected no settlement. He, however, dictated—or rather signed—a letter addressed to a committee representing the St. Louis subscribers, in which he stated:

"The stock which was purchased by you and the stockholders you represent, of the North Louisiana Drilling Corporation, I am convinced was acquired through our sales agent, Mr. J. E. P. Miller, under such circumstances as to render me as president of the company, and my associates in the company, Messrs. A. T. Kahn, Jake Metzler and Harold Wakefield, legally liable and reponsible to you for the money you expended in the purchase of stock, * * * and I am writing this letter to give you a positive assurance and guarantee that if you will not sue me or my said associates on account of the purchase of this stock until on or after May 24, 1920, I will and do hereby obligate myself * * * to repay to you and the stockholders which you represent their total outlays for the purchase of this stock. * * *"

Mr. Dickinson was asked:

"Q. Were you acting alone for yourself or for yourself and these other gentlemen [Kahn and Metzler]?

"A. I don't know that I can answer that.

"Q. You did have a meeting before you went?

"A. Yes, sir."

When considered in the light of other evidence in the record manifesting the earnest desire of Kahn and Metzler that these St. Louis subscribers should be reimbursed what they had lost through the fraud of Miller, and in view of the letters of Kahn, and particularly the one of date March 20, just after a conference between Dickinson, Metzler, and Kahn, there can be no doubt that the expression of Dickinson in the letter above quoted represented the thought and purpose of the conference when the three were together just before Dickinson's visit to St. Louis.

[7] Mr. Metzler was not an original subscriber, nor did he sign the charter, but he agreed to take stock; he wrote letters introducing Miller as the representative of the concern, thereby lending his name to the promotion and financing of the company; and he participated actively in the affairs of the corporation. His brother-in-law was secretary, and the books and the office of the corporation were kept in his office. He indorsed paper to get money for the expenses of organizing and operating the company. He attended and took part in the conferences, and throughout was recognized and treated with,

by the other promoters and organizers, as one of their associates, and at no time did he disavow his connection with the promotion of the company, nor dispute his liability for the acts of the agent of the promoters, until his letter of May 10, 1920, addressed to the committee representing the defrauded stockholders of St. Louis, in which he disclaimed any connection with the company, though he admitted lending his name to Miller to aid him in disposing of the stock of the company.

In the light of the circumstances we have referred to, which are only a few of the important facts disclosed by the record, we are of the opinion that Kahn and Metzler are liable to the plaintiffs, and that the finding of the trial judge, who had these defendants before him and who knew them personally, is in strict accord with the evidence.

Judgment affirmed.

Rehearing denied by the WHOLE COURT.