In re Joe E. FRYAR, Debtor.

Edward C. ABELL, Jr., Carrie Walton, and the Class of Purchasers of Westside Habilitation Center Revenue Bonds, Plaintiffs,

v.

Joe E. FRYAR, Defendant.

Bankruptcy No. 89BK–80595.
Adv. No. 89AP–8059.

United States Bankruptcy Court,
W.D. Louisiana,
Alexandria Division.

Aug. 7, 1992.

Phillip A. Wittmann, Kyle D. Schonekas, Judy Y. Barrasso, Douglas D. Dodd, C. Lawrence Orlansky, and Marc D. Winsberg, Cecilia C. Woodley, Law Firm of Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiffs Edward D. Abell, Jr., Carey Walton and the Class of Purchasers of Westside Habilitation Center Revenue Bonds.

No appearance for debtor.

## REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This matter comes before the Court on the Motion for Summary Judgment filed by the Plaintiffs in their Complaint to Determine Dischargeability of Debt. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 22.01 incorporated into Local Bankruptcy Rule 1.2. The plaintiffs in this Adversary Proceeding filed a Motion to Withdraw the Reference of this Adversary Proceeding on August 15, 1989. A ruling was entered by the District Court dated January 29, 1990, denying the request. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to same, the Motion will be granted.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The facts which are the subject of this Complaint have been extensively litigated in a case styled "Abell v. Potomac Ins. Co.," Civil Action No. 84–1786, in the United States District Court for the Western District of Louisiana. Plaintiffs argue that the judgment in that action is now final, that it has collateral estoppel effect in this Adversary Proceeding, and that plaintiffs are entitled to summary judgment.

## I. Background

Suit was filed in July 1984, as a class action against Fryar and various other defendants. After a nine-week jury trial, a verdict was returned in favor of the plaintiffs on February 4, 1987.[1] The jury determined that Fryar had violated the Securities and Exchange Act of 1934, the Louisiana Blue Sky Law, RICO, his fiduciary duty and articles 1934 and 2315 of the Louisiana Civil Code. On February 19, 1987, the District Court entered judgment for the plaintiffs and against the debtor and various other defendants. Motions for judgment notwithstanding the verdict and for new trial were filed and denied by the District Court pursuant to a ruling dated March 26, 1986. An appeal followed to the Fifth Circuit. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104 (5th Cir.1988); hereinafter *"Abell I."* That opinion made an extensive summary of the facts underlying the litigation, beginning at page 1109, to which the reader of these Reasons is referred.

In *Abell I*, the Fifth Circuit affirmed the judgment in part, reversed it in part, and remanded the matter to the trial court with instructions. Among the determinations made by the jury were findings related to violations of RICO.[2] The Fifth Circuit affirmed the portion of the District Court's holding on those issues.

Fryar filed a Petition for Certiorari to the United States Supreme Court. On July 3, 1989, the United States Supreme Court granted writs in nine cases, including the District Court action. The issue presented was the sufficiency of a pattern of racketeering activity. All nine cases were remanded for reconsideration in light of *H.J., Inc., v. Northwestern Bell Telephone Company*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). On September 12, 1989, the Fifth Circuit remanded the matter to the District Court for reconsideration under *H.J.*

On remand, the District Court considered a motion by the plaintiffs for an "Order Upholding Jury Verdict, Readjusting Attorneys' Fee Award, and Recalculating Individual Plaintiff's Damage Award" together with Fryar's Motion to Dismiss the Civil RICO claims. The District Court held that the finding of RICO violations was "abundantly supported by the evidence." Judgment was entered for plaintiffs Abell, Walton and the Class Action purchasers in the amount of $2,550,000 with interest. Judgment was also entered in favor of Abell for $564.72 and in favor of Walton for $1,129.26, both bearing interest. Further, the plaintiffs were awarded judgment against Fryar for $2,359,177.42 representing reasonable attorney fees. Only a portion of the attorney fee award is payable to plaintiffs' counsel. The balance is payable to the plaintiffs. Further judgment was awarded in the amount of $263,743.00 for costs and expenses of the litigation compensable under RICO but not taxable under 28 U.S.C. 1920.[3]

This judgment was affirmed by the Fifth Circuit. *Abell v. Potomac Ins. Co.*, 946 F.2d 1160 (5th Cir.1991), hereinafter *"Abell II."* Writs were denied by the Supreme Court. *Abell v. Potomac Ins. Co.*, —— U.S. ——, 112 S.Ct. 1944, 118 L.Ed.2d 549 (1992).

Fryar filed a voluntary petition under Chapter 11 on May 2, 1989. The case converted to a case under Chapter 7 on July 13, 1990. The stay was lifted by order dated January 3, 1990, to permit the liquidation of the claims in the District Court action and the completion of the appeals.

## II. Plaintiffs' Contentions

Plaintiffs maintain that Fryar's debt to them is nondischargeable under 11 U.S.C.

---

1. During the course of the jury trial, Fryar engaged in various acts which ultimately led to a conviction on eight counts of obstruction of justice. *U.S. v. Fryar*, No. CR–87–60027 (W.D.La.1988). The facts relating to the jury-tampering matter are discussed in *Abell I*. His conviction was affirmed. *U.S. v. Fryar*, 867 F.2d 850 (5th Cir.1989). Fryar was later convicted of money laundering. *U.S. v. Fryar*, No. CR–89–160 (E.D.La.1989).

2. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

3. Judgment, United States District Court, Western District of Louisiana, Lafayette–Opelousas Division—Civil Action No. 84–1786 filed September 5, 1990. Memorandum in Support of Motion for Summary Judgment, hereinafter "Memorandum;" Exhibit F.

§§ 523(a)(2)(A) and (B), (a)(4) and (a)(6). Plaintiffs' note that the applicable burden of proof is a preponderance of the evidence. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). It is further asserted that the doctrine of collateral estoppel applies. In the Fifth Circuit, the following criteria govern the application of this doctrine in bankruptcy cases:

1. That the issue at stake is identical to the one involved in prior litigation;

2. That the issue was actually litigated in the prior litigation;

3. That the determination of the issue in the prior litigation was a critical and necessary part of the judgment in the final litigation.

*Freeman v. Lester Coggins Trucking, Inc.,* 771 F.2d 860, 862 (5th Cir.1985); *Stovall v. Price Waterhouse Co.,* 652 F.2d 537, 540 (5th Cir.1981); *White v. World Finance of Meridian, Inc.,* 653 F.2d 147, 151 (5th Cir.1981).

### III. Applicable Law on Summary Judgment

■ Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings pursuant to Bankruptcy Rule 7056, provides in pertinent part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results. *Murrell v. Bennett,* 615 F.2d 306 (5th Cir.1980).

In ruling on a motion for summary judgment, the evidence should be considered in the light most favorable to the non-movant. *Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir.1983). However, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### IV. Undisputed Facts

The motion for summary judgment and attachments were mailed to the debtor on June 17, 1992. The attachments properly included plaintiffs' statement of uncontested facts. *See* Section VI, *infra.* Under the Uniform District Court Rules, a response in opposition to a motion is required to be filed within 10 days of service. ULLR 2.07 M & W. An opposition to a motion for summary judgment,

> "... shall include a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for the purposes of the motion unless controverted as required by this rule."

ULLR 2.10 E. & W.

The hearing on this matter was noticed on June 18, 1992. A hearing was held on July 22, 1992. No opposition to the motion was filed on or before the hearing. On July 27, 1992, a document was received in letter form from Fryar. Fryar is presently incarcerated.

### V. Discussion

Plaintiffs assert in their supporting memorandum that the facts proven in the district court action establish the non-dischargeability of the debt. They first submit that the jury responded in the affirmative to three interrogatories concerning violations of §§ 1962(a), (b) and (c) of the RICO act. The jury concluded that Fryar had conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity. This was predicated upon their findings of mail fraud and wire fraud.[4]

The trial court's jury instructions included a requirement that the jury determine whether the mail fraud statute, 18 U.S.C. § 1341, was violated by a preponderance of the evidence. Further, the jury was required to find that "the person knowingly

4. *See* Memorandum, *supra,* pp. 17–18.

and intentionally attempted to deceive another in order to establish fraudulent intent." The jury was also instructed that to have violated the wire fraud statute, plaintiffs were required to prove that Fryar used the telephone in the execution of the scheme to defraud.[5]

The District Court rejected Fryar's motion for judgment notwithstanding the verdict. It made express findings of the sufficiency of the evidence concerning the violations of § 1930(a), (b) and (c). Ruling, March 26, 1987, pp. 16–17; Memorandum, Exhibit C.

The Fifth Circuit in *Abell I* noted:

"Here, plaintiffs allege that Fryar had repeatedly used the mails to execute a scheme to sell Westside bonds with the intent of defrauding the purchasers. The record amply supports the jury's conclusion that Fryar, intending to defraud potential investors, devised and employed a scheme to sell Westside bonds. Fryar knowingly misled prospective bondholders about a land transaction that significantly affected Westside's financial structure. He falsely suggested that he had backed the health-care project with $2,000,000 of his own money. Obviously, the jury could find that Fryar had a reasonably calculated plan to deceive persons of ordinary prudence and comprehension into giving Westside their money."

858 F.2d at 1130.

In *Abell II*, the Fifth Circuit noted that the facts had not changed since the holding in *Abell I*. 946 F.2d at 1168.

The jury was requested to make findings concerning Fryar's violations of § 10(b) and 10(b)(5) of the Securities Exchange Act of 1934. Instructions were given concerning the element of materiality and a reasonable investor. The jury was instructed concerning the terms "knowingly" and "scienter." Instructions were given concerning "reasonable reliance."[6] The jury was instruct-

ed that plaintiffs were required to prove by a preponderance of the evidence that Fryar:

"(1) knowingly or recklessly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers;

(2) that the securities marketed by the defendants could not have been marketed absent the scheme;

(3) that the plaintiffs reasonably relied on the availability of the securities in the market as an indication of their apparent genuineness; and

(4) that as a result of the defendants' scheme to defraud, plaintiffs suffered a loss."

Jury Instructions, *supra*, p. 46.

Plaintiffs observe that:

"The Fifth Circuit noted that the defendants did not deny that they had made false and misleading statements regarding Westside, nor did they contest that they made the statements with scienter. *Abell I*, 858 F.2d at 1116. Specifically, the Fifth Circuit found that:

'Plaintiffs proved, to the jury's satisfaction, that the Westside project was less feasible than Fryar had represented, and that Fryar misrepresented key facets of Westside's financial structure. Most significantly, Fryar withheld the details of his land transaction with All American, of All American's huge profit when it resold the same land to Westside, and of his $2 million, pledge, of which money none came from his own pocket.' "

Plaintiff's Memorandum, p. 26, *citing Abell I*, 858 F.2d at 1129.

The plaintiffs also submit the Fifth Circuit determined the jury properly found that the facts that were either misstated or omitted by Fryar in the offering documents relating to Westside were material; "that is that a reasonable investor would consid-

---

**5.** *See* Jury Instructions, p. 71, Civil Action No. 84–1786, United States District Court for Western District of Louisiana, Lafayette–Opelousas Division, hereinafter "Jury Instructions;" Memorandum, Exhibit H.

**6.** *See* Jury Instructions, *supra*, pp. 35–44.

er those facts important in evaluating Westside's initial offering of the bonds." *Id. citing* 858 F.2d at 1116–17.

The Fifth Circuit, plaintiffs submit, further ruled that the plaintiffs had "justifiably relied" on Fryar's misrepresentations in making their own investments. Both plaintiffs had read a sales circular and relied on oral representations by their brokers.[7] Finally, plaintiffs allege that causation was proven, inasmuch as the "misrepresentations and omissions in the offering statements were a proximate cause of the investment's decline in value and the resultant loss to the plaintiff investors." Further, they maintain that the Fifth Circuit determined that the jury was entitled to believe that the land transaction was a proximate cause of the collapse of the scheme and the resulting loss to the plaintiffs.[8]

The jury was also instructed regarding state law and the meaning of the term fiduciary. The jury was instructed as to the duty owed by a fiduciary and that if Fryar failed in his duty the jury could find him liable for misrepresentation. Instructions were given on the Louisiana law of fraudulent misrepresentation.[9] The Fifth Circuit found that Fryar at all times controlled Westside. He, not its Board of Directors, made the decisions.[10]

### VI. Nondischargeability
#### A. Under § 523(a)(2)(A)

■ Under this provision, debts are excluded from discharge "to the extent obtained by … false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.…" A false representation need not be overt. It may be inferred from acts or conduct. *In re Biedenharn*, 30 B.R. 342, 346 (W.D.La. 1983). Plaintiffs note the similarity of the case at bar to *In re Coolidge*, 459 F.Supp. 133 (N.D.Ga.1978), *In re Roberts*, 81 B.R.

354 (Bankr.W.D.Pa.1987), and *In re Nix*, 92 B.R. 164 (Bankr.N.D.Tex.1988). In those matters, judgments had been obtained in civil proceedings against debtors based on allegedly fraudulent acts. Here, in addition the Fifth Circuit twice noted the control by Fryar of Westside, thus, insider status is present. 11 U.S.C. § 101(31)(A).

This Court's review of the jury findings above convinces it that all of the necessary elements of § 523(a)(2)(A) have been established.

#### B. Under § 523(a)(2)(B)

■ This section excepts from discharge any debt for money, property or services to the extent obtained by the use of a statement in writing that is (1) materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor reasonably relied; and (4) which the debtor caused to be made or published with intent to deceive.

Plaintiffs direct the Court to the test enacted by the Fifth Circuit in *In re Jordan*, 927 F.2d 221 (5th Cir.1991). There, the Court observed:

"A materially false statement is one that 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.' *In re Nance*, 70 B.R. 318, 321 (Bankr.N.D.Tex.1987), citing *In re Denenberg*, 37 B.R. 267 (Bankr.D.Mass. 1983). Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is 'whether the lender would have made the loan had he known the debtor's true situation.' *In re Bogstad*, 779 F.2d 370, 375 (7th Cir.1985). Finally, it is well-established that writings with pertinent omissions may qualify as 'materially false' for purposes of § 523(a)(2)(B). *In re*

---

**7.** *See* Memorandum, *supra*, pp. 27–28, *citing* Ruling, March 26, 1987, p. 9.

**8.** *See* Memorandum, *supra*, p. 28, *citing Abell I,* at 1117.

**9.** *See* Memorandum, *supra*, p. 29, *citing* Jury Instructions, *supra*, pp. 50–53.

**10.** Abell I at 1109; *Abell II* at 1162.

*Biedenharn,* 30 B.R. 342 (Bankr.W.D.La. 1983)."

927 F.2d at 224.

These same factors were considered by the jury in the instant case. Fryar solicited funds from the investors through offering documents. Those documents were found to be materially false. They related to the financial condition of Fryar and Westside. Plaintiffs reasonably relied upon them. Fryar caused them to be distributed with the intent to deceive. This Court finds that the necessary elements for a determination of non-dischargeability under § 523(a)(2)(B) have been established.

### C. Under § 523(a)(4)

■ This provision excludes debts from discharge arising "from fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

■ Here, the jury found that Fryar, the promotor of the Westside project, had a duty to plaintiffs under Louisiana law. State law is a factor in determining the legal basis of a trust relationship. *In re Chris J. Roy, A Law Corporation,* 130 B.R. 214 (Bankr.W.D.La.1991). The fiduciary relationship must exist independently of the act creating the debt. *Matter of Moreno,* 892 F.2d 417 (5th Cir.1990).

Here, plaintiffs cite the Louisiana Supreme Court's definition of a "promotor" as "one who organizes, solicits subscribers for, or finances an investment scheme." Memorandum, *supra,* p. 40, *citing Smalley v. Bernstein,* 165 La. 1, 10–11, 115 So. 347 (La.1927), *cert. den.* 277 U.S. 599, 48 S.Ct. 561, 72 L.Ed. 1008 (1928). In the *Smalley* case, the Louisiana Supreme Court observed:

> "There can be no question but that a promotor stands in a fiduciary relation to the corporation, which he is promoting, when the corporation comes into existence, and to subscribers prior to its creation...."

165 La. at 10, 115 So. 347.

Plaintiffs further cite *Grand Isle Campsites, Inc. v. Cheek,* 249 So.2d 268 (La.App. 1st Cir.1971), *modified,* 262 La. 5, 262

So.2d 350 (La.1972); *Reardon v. Dickinson,* 156 La. 556, 563–67, 100 So. 715 (La. 1924).

■ The plaintiffs must also show that a defalcation occurred. A defalcation is a willful neglect of duty. It need not be accompanied by fraud or embezzlement. *Matter of Moreno, supra.* There need be no showing that it was intentional or that funds were diverted to the fiduciary's benefit. *Carey Lumber Co. v. Bell,* 615 F.2d 370, 376 (5th Cir.1990). The default in the obligation may be an innocent default on the part of the fiduciary. *In re Johnson,* 691 F.2d 249, 255 (6th Cir.1982). Recourse may be had to state case law for the proposition a securities broker is a fiduciary to its customers. *In re Scheuer,* 125 B.R. 584 (Bkrtcy.C.D.Cal.1991); *Compare In re Sawyer,* 112 B.R. 386 (D.Colo.1990).

There can be no question after considering the jury's findings, the rulings of the District Court, and the Fifth Circuit's decisions that Fryar was Westside's promotor. As such, he stood in a fiduciary capacity to plaintiffs independent of the misrepresentations and fraudulent conduct in which he engaged. The jury received specific instructions concerning the meaning of the term.[11]

This duty was breached by; (1) his arranging to sell the property from All American to Westside for over fifteen times its value, (2) misleading the investors into believing he had his own funds at risk and (3) the non-disclosure of an adverse feasibility study. In fact, the jury determined that actual fraud occurred. *See Roberts and Coolidge, supra.*

### D. Under § 523(a)(6)

■ This section excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Fifth Circuit has interpreted the term "willful" as meaning "without just cause or excuse." *Seven Elves Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983). In *In re Nix,* 92 B.R. 164 (Bankr.N.D.Tex.1988), the Court ap-

---

**11.** *See* Jury Instructions, *supra,* p. 50.

plied the doctrine of collateral estoppel to a civil RICO judgment. The instructions in that matter were similar to the instructions to the jury in the instant case.

Louisiana recognizes causes of action for the wrongful act of repudiation of ownership of an owner's right to property or an exercise of dominion over it inconsistent with the rights of the owner. The Louisiana action is discussed extensively in *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480 (5th Cir.1986).

The jury in the instant case found the actions of Fryar to be willful and malicious. It found that Fryar actually intended to misrepresent material facts and to profit improperly from his control of Westside. This Court finds that Fryar's willful and malicious acts are sufficient for a denial of discharge under § 523(a)(6).

### VII. Fryar's "Opposition"

■ Fryar's belatedly filed opposition does not comply with the filing requirements of the District Court Rules. Under ULLR 2.08W, a response to a motion is required to be filed within ten days after service. If an extension of time is needed to respond, it may be sought by *ex parte* motion served on all parties. Under Rule 2.10 E & W, the opposition to a motion for summary judgment "shall include a separate, short, and concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule."

"Plaintiffs' Statement of Uncontested Material Facts" was filed with their Motion for Summary Judgment in accordance with ULLR 2.09. The Certificate of Service reflects the date of June 17, 1992. Those "facts" are as follows:

"1. Plaintiffs Abell, Walton, and the Class filed suit against Fryar and others in a case entitled 'Abell v. Potomac Ins. Co.,' Civil Action No. 84–1786, in the United States District Court for the Western District of Louisiana (the 'District Court Action').

2. Fryar and others formed a corporation named Westside Habilitation Center, Inc. ('Westside') in 1979.

3. Fryar and others caused Westside to issue bonds to the public.

4. All American Services Co., Ltd. ('All American') was a Bermuda Corporation organized and controlled by Fryar.

5. On January 3, 1978, Fryar purchased property in Cheneyville, Louisiana (the 'Cheneyville Property').

6. Fryar paid $100,000 for the Cheneyville Property.

7. The Cheneyville Property's appraised value was approximately $100,000 at the time Fryar purchased the Cheneyville Property.

8. In 1981, Fryar sold the Cheneyville Property to All American.

9. All American paid $150,000 for the Cheneyville Property.

10. In 1982, All American sold the Cheneyville Property to Westside for $2,459,700.

11. No improvements had been made to the Cheneyville Property when All American sold it to Westside in 1982.

12. Westside paid All American $2 million of the purchase price of the Cheneyville Property in Westside bonds, and the remainder in cash.

13. Fryar pledges the same $2 million worth of Westside bonds to secure his performance of his duties as a developer of Westside.

14. At all pertinent times hereto, All American retained its ownership of the $2 million in Westside bonds connected with the purchase of the Cheneyville property.

15. The offering documents relating to the Westside bonds did not disclose that Fryar once had owned the Cheneyville Property.

16. The offering documents relating to the Westside bonds did not disclose

that Fryar had sold the Cheneyville Property to All American.

17. The offering documents relating to the Westside bonds disclosed the value of the Cheneyville Property as $2,479,000.

18. The offering documents relating to the Westside bonds stated that Fryar had pledged $2 million worth ·of the Westside bonds to secure his performance as a developer of the project.

19. The offering documents relating to the Westside bonds did not disclose that All American actually owned the $2 million worth of Westside bonds pledged by Fryar.

20. The offering documents relating to the Westside bonds did not disclose to potential investors in Westside the existence of an adverse feasibility study done by the firm of Booz, Allen & Hamilton, Inc. ('Booz, Allen').

21. Among other things, the Booz, Allen feasibility study predicted that Westside would have difficulty paying the bondholders the interest due them.

22. Westside defaulted on four interest payments on its bonds between October 1984 and April 1986.

23. In March 1985, Westside filed bankruptcy.

24. Pursuant to the plan adopted in Westside's bankruptcy reorganization, the bondholders, including plaintiffs, were to be paid substantially lower interest rates than had originally been promised to them, resulting in a loss to the bondholders.

25. Fryar was the promoter and developer of Westside and the Westside project.

26. Fryar controlled Westside and made all its decisions.

27. Fryar made false statements and omitted to state material facts in connection with the promotion and marketing of the Westside bonds.

28. Fryar knew that certain statements he made in connection with the sale of the Westside bonds were false.

29. Fryar knowingly did not disclose certain facts in communications relating to the sale of the Westside bonds.

30. Fryar made statements or omitted to disclose material information relating to Westside's financial condition.

31. Fryar used the telephone on numerous occasions for the purpose of executing a scheme to defraud in connection with the sale of the Westside bonds.

32. On numerous occasions Fryar used the United States Postal Service by mailing, or by causing to be mailed, some matter or thing for the purpose of executing a scheme to defraud the investors in the Westside bonds.

33. Fryar used a means or instrumentality of interstate commerce to sell the Westside bonds.

34. Fryar personally profited from his sale of the Cheneyville Property to All American.

35. Fryar personally profited from the sale of the Cheneyville Property by All American to Westside.

36. Fryar personally profited by the sale of the Westside bonds.

37. Fryar personally profited by an amount in excess of $1,300,000 from the operation of Westside.

38. Plaintiff Abell's decision to invest in the Westside bonds was influenced by Fryar's misrepresentations and omissions of fact about the Westside bonds and the project.

39. Plaintiff Walton's decision to invest in the Westside bonds was influenced by Fryar's misrepresentations and omissions of fact about the Westside bonds and the project.

40. Fryar intended to defraud the plaintiffs.

41. Plaintiffs lost in excess of $12 million on their investments in the Westside bonds.

42. Fryar was convicted of eight counts of obstruction of justice for attempting to bribe the jury during the trial."

Plaintiffs' Statement of Uncontested Material Facts, pp. 1–6.

 Fryar's response is an undated letter to the Court post-marked July 23, 1992. All post-markings reflect the Alexandria, Louisiana post office. The return address is "Joe Fryar, 06590–035, FPC Box 13, Jesup, Ga. 31545." In the document, Fryar requests "whatever time extension is necessary to file this letter late." This request is untimely. Further, it bears no certificate of service. ULLR 1.09. It also does not set forth, separately, a statement of matters on which there exists a genuine issue to be tried.

The response begins with a reference to his receipt of a "strange mailing" concerning "Adversary Proceeding # 89AP–8059." Complaints regarding counsel to debtor (debtor is presently unrepresented by counsel in the related bankruptcy case and in this Adversary Proceeding) and counsel to movant follow. Debtor maintains he is "really and truly penniless and [has] another five years to serve in prison."

Fryar then responds generally as follows:

"I noticed a statement entitled 'Plantiffs (sic) Statement of Uncontested Facts.' Some of htose (sic) statements may not be contested in bankruptcy court but most of them are mis-stated (sic) and some are just plain lies. I state the truth corresponding to the number of the lie. If there is any wish or need to construe my responses—any kind of motion or response then do so because I am broke and don't know what is legal or proper anyway."

Joe Fryar letter.

Fryar then responds to the foregoing Plaintiffs' statements as follows:

"1. okay

2. I formed no corporation named 'Westside' or any derivation thereof. I own no stock nor had any office in any such corporation and never did.

3. I caused no bonds to issue to anyone. I was hired as Architect/Developer. Mr. Joe Hancock was the investment banker and ramrod of this effort. He came on the scene after I had given up and abandoned the project.

4. I believe that 'All American Services' was created, owned and operated by H. Clayton Chambers, a private investor.

5. okay

6. okay

7. The property was appraised by the 'Rapides Parish School Board' for around $250,000 initally (sic) (I don't recall exactly) but they received no bids. They afterward had the property reappraised for a lower price. I submitted a sealed bid for $100,-000 (the only bid) and got the property. I felt that I had gotten a bargin (sic) and the school board was satisfied. The bids were sealed—the process public.

8. okay—I owned the property about four years during which I cut grass, maintained the buildings and paid taxes.

9. okay—I sold the property for $50,000 more than I paid for it.

10. Mr. H. Clayton Chambers, owner of All American Services made arrangements with investment banker Joe Hancock for All American Services to sell the property to Westside for a price that would include:

'a. $150,000 purchase price of the property from me.

b. All American would guarantee the Developer Fryar's performance and pledge $2,000,000 of Westside's bonds for that purpose.

c. All American would underwrite to the developer 100% of the projects start cost estimated to run up to $1,500,000.

d. All American was to (and did) take payment in Westside bonds, not cash. At that time the bonds were worth nothing because the project was just an idea.'

11. Outright lie: The buildings had been re-roofed and maintained for four years.

12. This is misleading-the price was not solely for the purchase of real estate. See answer to Item # 10 (sic) above.

13. Lie/Fryar pledged no bonds. All American Services accepted bonds in lieu of cash because Westside had no cash. Those same bonds were in turn pledged to Fryar's performance and the facility's start up cost.

14. I don't understand the significance of this statement. However, All American never received or possessed these bonds. The bonds were delivered to and held by the trustee bank, pending performance by Fryar. Fryar performed as per his contract, but All American was never paid.

15. I have no knowledge of that. My only input to the offering documents was the construction cost estimate and my own professional qualifications. The documents in question were performed by Investment Banker Joe Hancock, Underwriter Swink and Co and Bond Attorneys Peck, Shaffer and Williams. My prior ownership was public record and had been for over four years.

16. I have no knowledge of that or why it is significent (sic).

17. The purchase price included the property, the start-up cost, the architects performance, all as outlined in answer # 10. The owner always pays for these services if he wants them.

18. The pledge of Westside bonds by All American was to guarantee my performance as outlined in answer # 10. The bonds were to pay All American for those services and the property. All American was never paid.

19. I have no knowledge of this and I had no input into the disclosure documents, except as outlined by answer # 15.

20. I had no authority to include or exclude anything from the disclosure documents and did not except as indicated in answer # 15.

21. I don't know the significance of this, but I hasten to point out that West-side has missed no payments since it has been occupied and turned over to Westside, Inc. Theyhave (sic) a bank surplus and are considering calling the bonds at this time.

22. Delay in making the first interest payments was because of the one year delay in retrieving Westside funds due to the bank failure of the bank in which the trustee deposited the funds. Construction was stopped during this period, not (sic) interest earned, no additional construction cost added and evidently no additional time granted to the developer to complete the project although he almost single handed fought the long expensive legal battle that finally resulted in getting the funds restored by the FDIC.

23. Westside filed bankruptcy only because of the construction delay. During the delay the State of Louisiana changed its method of payment for patient care which resulted in a net reduction of the funds that would be available for paying bond interest.

24. Bondholders interest payments were reduced because of the construction delay fromented (sic) by the closure of the bank in which the money was deposited as explained in answers # 22 and # 23. It should be noted that the bondholders have lost no money. The principal and a rate of interest of about 1% tax exempt has been maintained. No principal has even been lost or compromised.

25. Lie/Fryar was the Developer/Architect for the project, *not promoter*. I had a contract designating me as Developer/Architect which deleniated (sic) what I would do and what I would change.

26. So silly it requires no response.

27. Lie/Fryar did not promote or sell even one Westside bond.

28. The estimated cost and my own professional qualifications were the only statements made by me relative to Westside and they are true. I sold no bonds. See answers # 15, 19 and 27.

29. I don't understand this statement.

30. My knowledge of Westside's financial condition was only during construction

and initial occupancy. Each month during that period, Mr. Hancock received a written report from me showing construction cost, occupancy levels, etc. As to the corporations financial condition, I did not know it nor did I need to know it. I was simply trying to build and get the project occupied.

31. I did not sell even one bond and had no scheme to defraud.

32. I did not mail even one letter of any kind to any investor. I simply was not in the business of selling bonds, was not licensed to sell bonds and sis (sic) not sell any bonds. I have been solely an architect for thirty years.

33. I don't understand this, but I sold no bonds.

34. I bought the property at auction for $100,000, held it for about four years, paid taxes, replaced roofs, maintained the buildings and grounds. I sold it for $150,000. After deducting the costs of ownership over four years and taking depreciation, I probably did make a profit or I am sure that I thought that I did at the time.

35. Lie/I received not one penny from All American Services except the $150,000 purchase price of the buildings and reimbursement of around $10,000 to cover some legal fees and expenses paid out by me on behalf of Mr. Clayton Chambers, who owned All American Services.

36. Lie/I received no commission or fee of anykind (sic) from the sale of the bonds or because of the sale of the bonds. I was paid only for the work that I contracted to do that was via check from the trustee.

37. Lie/During the period of start-up and before the percentage of occupancy was reached that would allow me to turn the facility over to Westside, Inc; there was income from the state which was, as per agreement, utilized to offset the cost of start-up operation. The deficit in this cost was borne by me to be reimbursed to me by All American. There was no profit during this period. All American bonds were not delivered to them, therefore, they refused to pay me. Nobody got any money but 'Stone Pigman'.

38. Lie/Abel's (sic) decision was sorely influenced by a phone call from fellow lawyer and friend Charlie Weems of Alexandria, who suggested that since he 'Able' (sic) owned a bond of Westside, that a class action suit against Westside could be profitable. Weems suggested that Phillip Wittman of New Orleans would be interested in handeling (sic) it on a contingency and a little fee splitting would make it profitable for all because everyone would probably settle out of court to avoid a costly trial.

39. Lie/Walton was influenced by his good friend, lawyer and fellow church member, Able. (They had just returned from a church marriage encounter with their wives).

40. Lie/Fryar did not know the plaintiffs or any of the bond holders, sold no bonds, and even to this date, neither Walton, Able, nor any holder of Westside bonds lost one penny of the money they invested.

41. Lie/No bondholder has lost any money on Westside to date. The facility os (sic) 100% occupeid, (sic) is funding every account and every bond still exist and is receiving interest payments. The entire bond issue was 13.5 million. All American was not paid, so that would reduce the issue to 11.5 million. The development contract was only 5 million; therefore, a loss of 12 million would mean that there is no facility at Cheneyville. It is there and 100% occupied ... Please go look at it.

42. The charge is mistated, (sic) but I am not qualified to address the significience (sic) of it. I would just ask, if the court is being asked to punish me further for that which I am already serving time? Is the court being asked to 'pile-on' or punish again? I guess I don't understand.' "

Joe Fryar Letter.

Assuming this response is properly before the Court, taken at its best it would appear to be nothing more than a collateral attack on the jury's findings with regard to Fryar's involvement in the Westside project and his relationship with All–American.

Fryar in this response attempts to attribute the cause of plaintiffs' damages to

third parties; however, the jury was instructed regarding this contention.[12] This issue was disposed of adversely to Fryar by the trier of facts. The District Court's ruling on the post-trial motion for judgment notwithstanding the verdict concluded:

> "Substantial evidence was adduced at trial from which a reasonable jury could infer the existence of a scheme or artifice to defraud. It is obvious that Fryar caused All American to be organized for the express purpose of concealing that a profit in excess of $2 million was to be made on the sale of the Cheneyville property. Fryar was the only party in contact with All American, and it was Fryar who caused the documents necessary to effectuate the scheme to be mailed to all American and to other parties involved in the transaction...."

Ruling Filed March 26, 1987, p. 16.

The Fifth Circuit in *Abell I* (at page 1117) rejected the contention that the evidence was insufficient to prove that Westside misrepresented facts that caused its bankruptcy and the resulting reduced interest rates paid the bondholders. In *Abell II* the Fifth Circuit reiterated the facts briefly and affirmed the judgment of the District Court. There the Court concluded:

> " ... [T]he facts adduced at trial and piled up high against Fryar—some 500 bondholders cheated out of millions of dollars in a scheme that spread itself out over more than six years—are damning. We have no need to sharpen our pencils for subtle RICO analysis: Fryar's mail fraud violations and the fact that these violations were, as observed by the district court, strung together by the making-money-at-the-expense-of-bondholders objective realized by Fryar are enough. Fryar's conduct has, therefore, easily surpassed the RICO threshold, and we affirm the district court's RICO judgment against him."

*Abell II* at 1168.

Similarly, the facts "pile up high" against Fryar on the issue of non-dischargeability. No useful purpose would be served by requiring that these matters be relitigated. The requirements for the application of the doctrine of collateral estoppel are met. The burden of proof required by *Grogan v. Garner* is not only met but exceeded. The "damning" facts here would satisfy any burden. Despite Fryar's pleas, he is not, as plaintiffs note at page 17 of their memorandum, an " 'honest but unfortunate debtor' deserving of a fresh start." In the final analysis, Fryar's statement in his belated opposition that he " ... don't (sic) know what is legal or proper anyway," has a genuine ring of truth.

## CONCLUSION

For the reasons previously set forth, the Motion for Summary Judgment filed by the Plaintiffs is granted. The sums set forth in the judgment of the District Court in Civil Action 84–1786 are deemed to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (B), (a)(4) and (6). A separate, conforming order will enter.

---

12. *See* Jury Instructions, pp. 80 *et seq.*